**SUNKIST GROWERS, INC.,**
**Plaintiff-Appellant,**

v.

**ADELAIDE SHIPPING LINES, LTD.,**
**Claimant-Appellee,**

and

**Salen Reefer Services AB, and M/V Gladiola, Defendants-Appellees.**

**No. 76-3112.**

United States Court of Appeals, Ninth Circuit.

March 8, 1979.

Rehearing Denied April 19, 1979.

Stephen H. McReavy (argued), of Hall, Henry, Oliver & McReavy, San Francisco, Cal., for plaintiff-appellant.

Frederick W. Wentker, Jr. (argued), of Lillick, McHose & Charles, San Francisco, Cal., for claimant-appellee.

Before DUNIWAY and KILKENNY, Circuit Judges, and McGOVERN, District Judge.*

KILKENNY, Circuit Judge:

This is an appeal in admiralty from a judgment dismissing appellant's complaint *in rem* and *in personam* against appellees for cargo damage aboard the vessel GLADIOLA.

### FACTS

The facts are not seriously in dispute. Appellant [Sunkist] is a California corporation engaged in packing and shipping citrus fruit. Claimant [Adelaide] is a corporation organized and existing under the laws of Great Britain and is the owner of the vessel GLADIOLA, a general cargo vessel of 11,890 tons carrying capacity. Salen is a corporation organized and existing under the laws of the country of Sweden and at all times relevant herein was the charterer of the GLADIOLA.

During the last week of August and the first week of September, 1974, at the Port of Long Beach, California, a cargo of 58,464 cartons of fresh lemons in good order and condition, owned by Sunkist, was loaded on board the GLADIOLA for refrigerated transportation to Gdansk, Poland. Sunkist and Salen conducted their shipping transactions pursuant to a three year contract. Salen provided the vessels once or twice a week to transport Sunkist's citrus cargoes. Occasionally, Sunkist would not fill the entire vessel with its cargo and in those instances, and under the terms of the contract, Salen could arrange for additional cargo to be shipped and would make stops en route to load this extra cargo. Employees of Sunkist and Salen were in daily contact by telephone and telex. When additional cargo was to be transported, Sunkist was informed by telex of the type of cargo that would be loaded and the additional stops that would be made in order to pick up the extra cargo. As long as the additional loading stops did not unduly delay the ship's arrival in Northern Europe, nor adversely affect the citrus crop shipped by Sunkist, it did not object to deviations from a direct course to Northern Europe. In this instance, Sunkist was informed by telex that the vessel would be stopping in Ecuador to load bananas. It did not object. The GLADIOLA departed Long Beach on September 2, 1974, for Ecuador, arriving and anchoring in Guayaquil Harbor on September 10th.

On that day, at approximately 5:50 P.M., a fire broke out in the engine room. This room was automated and normally in unmanned status, as it was at the outbreak of the fire. The cause of the fire was a separation of a Serto compression pipe fitting and an Ermerto ferrule in the low pressure diesel fuel line of the vessel's number 1 generator. The diesel fuel sprayed on to hot surfaces of the numbers 1 and 2 generators.

Cummings, an extra third engineer in charge of answering alarms from the unmanned engine room, upon hearing the fire alarm, picked up his ear muffs and went to the engine room where he proceeded to the generator flat. He observed a break in the fuel line and oil splashing onto the hot exhaust turbo chargers of the numbers 1 and 2 generators. At that time there were no flames. Then occurred what might well be described as a Shakespearean comedy of errors, with a result akin to one of his tragedies. Because he had no training in

* The Honorable Walter T. McGovern, United States District Judge for the Western District of Washington, sitting by designation.

fighting engine room fire and no one had instructed him on what to do in such an emergency, Cummings failed to use the diesel oil turn off screw two or three feet below the joint, nor, for the same reason, did he turn off another valve some twenty to twenty-five feet from the generator on the main diesel oil supply line. This valve could have been closed by pulling a pin on a quick release mechanism. The second engineer arrived at the scene about this time but, inasmuch as his fire fighting training was no better than Cummings', he also failed to close either valve. After reporting the fire to the control room, Cummings returned to stop the generator, but when he returned the flames prevented him from getting close enough to the valve. While the fire was still confined to the number 1 generator and the area immediately above it, the second engineer attempted to use the 50 kilogram fire extinguisher but turned the control valve on the extinguisher in the wrong direction and broke it, rendering the extinguisher completely inoperative. The valve on this fire extinguisher was activated by screwing the value clockwise, rather than counterclockwise. Cummings wasn't even aware of the location of this "left-handed monkey wrench." While the second engineer was rendering the large fire extinguisher inoperable, Cummings went back to the control room and reported the generator on fire. It was not until then that he shut off the fuel to the pumps on the number 1 generator by means of a simple switch.

The fire spread rapidly to the oil in the bilges and along the inflammable butyl insulated electric cable, thus filling the engine room with dense smoke. Within minutes the vessel blacked out and the engine room had to be evacuated. It was then determined that the chief engineer was still on the refrigeration flat. While attempting to locate the chief engineer, Cummings stumbled over his body. He appeared to be dead. After attempts to save the engineer failed, the captain finally ordered the remotely controlled $CO_2$ fire extinguisher system in action, but the fire was out of control and could not be extinguished by the use of this system. Three days later, on September 13, 1974, the fire was extinguished, but the damage was very extensive. The chief engineer died in the fire and the captain suffered a fatal heart attack a couple of days later.

Although the lemons had not been damaged in the fire, the destruction of the refrigeration equipment made it necessary to find local refrigerated storage, local markets, or transshipment of the lemons. All of these efforts failed and it became necessary to give the lemons to the military authorities for distribution to the people.** The value of the lost lemon crop was stipulated at $350,784.00.

### ISSUES ON APPEAL

From a decision of the district court holding that both appellees were protected from liability by the fire exemption statutes, appellant appeals and raises three issues:

I. Were appellees required to exercise due diligence to make the GLADIOLA seaworthy as a prerequisite to claiming a fire exemption under the Carriage of Goods by Sea Act of 1936, 46 U.S.C. §§ 1300, et seq.?

II. Was there a lack of due diligence on the part of appellees either in connection with the defects in the vessel which caused the fire and contributed to its spread or in failing to man the GLADIOLA with a crew properly trained in fighting fires in ships' engine rooms?

III. Did the GLADIOLA'S deviation to Guayaquil deprive the appellees of the fire exemption?

### DISTRICT COURT'S FINDINGS AND CONCLUSIONS

In its findings of fact, the district court found, among other things, that the GLA-

** This may account for the unrest in Ecuador during the past few years.

DIOLA, prior to the commencement of the voyage, could have been made safe in the following respects:

"(1) The butyl lining on the electrical cables could have been sheathed in metal to reduce a blinding smoke in the event of fire;

(2) A flange joint, rather than a compression joint, could have been used on the fuel pipe leading into the generator, making a stronger connection;

(3) Fewer joints could have been designed in the pipe to reduce the possibility of leaks;

(4) Protective shields could have been placed around the generators to reduce the spray of hot fuel in the event of a leak;

(5) A SERTO ferrule could have been maintained in the particular fuel pipe joint that caused the leak, rather than the ERMERTO ferrule replacement that had been inserted;

(6) Barriers and fire dampers could have been placed along the electric cabling to control the spread of fire throughout the ship;

(7) Suits of protective fire clothing could have been maintained on board." 1976 A.M.C. 2597, at 2602.

After making these findings, the court went on to say that a prudent vessel owner and/or charterer would *not necessarily have made most of these modifications*, including a statement that although a Serto ferrule should have been maintained in the particular joint, "A failure to maintain the proper ferrule would be the fault of the crew in failing to report ferrule replacement, rather than the fault of the owner in failing to notice that a replacement had been made." Similar findings were made with reference to the other deficiencies mentioned by the court.

The court also found that the crew should have been given specific instructions on the proper way to deal with engine room fires and the exact method of handling fire ex-

tinguishers. Nonetheless, the court went on to say that a reasonable vessel owner and or charterer, in preparing to deal with fire, would have relied on the certification of its crew members, along with their prior fire fighting experience and training, ship drills and equipment labelled with instructions for use.

Based on its findings of fact, the district court concluded, among other things:

"* * *

4. In a fire loss case under the Carriage of Goods by Sea Act, or the Fire Statute, *the owner or charterer has the burden of proving that the loss resulted from the fire. The burden then switches to the shipper to show that the fire was the result of the design, neglect, fault, or privity of the owner or charterer. And I rely on the case of Asbestos Co. Limited v. Compagnie de Navigation, 1973 AMC at 1683, 480 F.2d 669 (2 Cir., 1973). In a fire case, the charterer and/or vessel owner do not have the burden of initially proving that they exercised due diligence in making the vessel seaworthy.* [Emphasis supplied.]

5. While this allocation of the burden of proof runs contra to the general scheme of proofs in shipping cases, since normally a shipper can recover merely by showing that he delivered the goods to the carrier in good condition and that the goods arrived damaged, American authority is clear that the fire exemption provisions shift the burden of proof to the shipper. The plaintiff's reliance on the Canadian authority of *Maxine Footwear Company v. Canadian Government Merchant Marine*, [1959] 2 Lloyd's Rep. 105, is misplaced. Although the Court in that case did place the burden of proving initial seaworthiness on the carrier, *that case was dealing with a Canadian statute fashioned on the Hague Rules.*" [Emphasis supplied.] 1976 A.M.C. at 2604.

## THE STATUTES

The fire exemptions touching upon the problem before us are the 19th Century

Fire Statute, 46 U.S.C. § 182 and the COGSA Fire Exemption, 46 U.S.C. § 1304(2)(b).

The 19th Century Fire Statute provides:

"§ 182. *Loss by fire*

No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, *unless such fire is caused by the design or neglect of such owner.*" [Emphasis supplied.]

COGSA, §§ 1301(a), 1303 and 1304(1) and (2), provide in pertinent part:

"§ 1301. *Definitions*

\*     \*     \*     \*     \*     \*

(a) The term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper."

\*     \*     \*     \*     \*     \*

"§ 1303. *Responsibilities and liabilities of carrier and ship*

*Seaworthiness*

(1) *The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to —*

(a) *Make the ship seaworthy;*

(b) *Properly man, equip, and supply the ship;*

(c) Make the holds, refrigerating and cooling chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage, and preservation. [Emphasis supplied.]

*Cargo*

(2) The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried."

\*     \*     \*     \*     \*     \*

"§ 1304. *Rights and immunities of carrier and ship*

(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness *unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied,* and to make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. *Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.* [Emphasis supplied.]

*Uncontrollable causes of loss*

(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\*     \*     \*     \*     \*     \*

(b) *Fire, unless caused by the actual fault or privity of the carrier;*" [Emphasis supplied.]

\*     \*     \*     \*     \*     \*

## HISTORICAL BACKGROUND

In order to fully understand the nature of the complex legal problems presented, we must view them in their historical context, including the Common Law of Maritime Carriage of Goods at Sea, the Limitation of Liability Act of 1851 (46 U.S.C. §§ 181–189), the Harter Act of 1893 (46 U.S.C. §§ 190–196), The Hague Rules as formulated by the Brussels Convention of 1924 and the Carriage of Goods by Sea Act of 1936 (COGSA) (46 U.S.C. § 1300, et seq.).

The Act of 1851 was passed by the Congress to promote the expansion of the American Merchant Marine and to protect the capital investment of those engaged in maritime shipping. It is clear that the leg-

islation was enacted for the purpose of placing American ship owning interests on a competitive basis with British interests insofar as limitation of liability was concerned. Gilmore & Black, The Law of Admiralty, Second Edition, § 10–1, *et seq.*, pp. 818–24. In addition to the Fire Statute Limitation (§ 182), the 1851 Act permitted the owner to limit his overall liability to the value of his interest in the vessel. (46 U.S.C. § 183).

Because the various sections of the 1851 Act were enacted together, the cases construing one section are frequently used to interpret another. In construing the 1851 legislation, the courts have held that while an owner may rely on the fire exemption therein mentioned, a time charterer such as the appellee Salen, is not an owner within the meaning of the Fire Statute and is precluded from relying on § 182 for exemption. *In Re Barracuda Tanker Corp.*, 409 F.2d 1013, 1015 (CA2 1969).

■ The subsequent history of maritime common carriage makes it obvious that the COGSA Fire Exemption of 1936, as distinguished from the 1851 Fire Statute, was part of an overall plan to settle the adverse interests of carriers and cargo shippers. This history is outlined in Gilmore & Black, The Law of Admiralty, Second Edition, §§ 3–22 to 3–24, pp. 139–144.

■ From that history, we gather that the British Courts generally upheld the validity of what was then commonly known as the "negligence" exceptions in bills of lading, while the federal courts in the United States held it against public policy for the carrier to contract itself out of liability for its own negligence. Consequently, when goods were carried under a bill of lading containing such a clause, the accessibility of courts or amenability to service of process made a crucial difference in the outcome of the litigation. In part as a result of this difference, the British Merchant Marine became dominant in the Atlantic. The United States, of course, was vitally interested in seagoing cargo, both export and import. Therefore, to partially solve this problem, the Congress in 1893 enacted the Harter Act, 46 U.S.C. §§ 190–96, which Act attempted to strike a balance between the interests of the carrier in being free from all claims based upon its negligence, and the shippers who wished to hold the carriers responsible for the consequences of any sort of negligence. In effect, the Harter Act declared "negligence" exceptions in the bills of lading to be null and void, but carriers would not be liable for goods damaged due to the shippers acts or omissions or for errors of the crew, if the carrier did exercise due diligence to make the vessel seaworthy and to properly maintain, equip and supply the vessel.

While this compromise served to protect a cargo shipper's interest with respect to litigation in American courts, shippers in most of the other countries of the world were still at the mercy of the exoneration clauses in the bills of lading, or at least of the different judicial interpretations of the clauses which carriers continued to carefully insert in the bills. As an outgrowth of the conflicts between these two warring factions, the interested antagonists, which included banking and underwriting interests, met at the World's Shipping Conference of 1920 to put the Harter Act principle into effect generally. As an outgrowth of these meetings, the Brussels Convention of August 25, 1924, promulgated what are commonly known as The Hague Rules which, with important additions,[a] amounted to an international adaptation of the Harter Act. However, the United States did not ratify the Convention or enact COGSA, a statutory codification of The Hague Rules, until 1936.

■ It is well recognized that The Hague Rules or COGSA have superseded the Harter Act with respect to foreign trade and

a. See Appendix A.

are *incorporated by reference in every bill of lading*[1] for foreign transport to and from the United States. It has been said that the primary purpose of COGSA is to protect carriers engaged in foreign trade to and from the United States against all-encompassing liability, while protecting the shipper's interest *by assuring that due care is exercised in making the ship seaworthy.* *Wirth, Ltd. v. S/S Acadia Forest*, 537 F.2d 1272, 1279 (CA5 1976). The intent of the Congress in passing COGSA is made absolutely clear by the language of Paragraph (8) of Section 3 of the original enactment, 49 Stat. 1209, 46 U.S.C. § 1303(8).

*"Limitation of liability for negligence*

(8) Any clause, covenant, or agreement in a contract of carriage *relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section,* or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect. . . ." [Emphasis supplied.]

This is the section which requires the carrier before and at the beginning of the voyage to exercise due diligence to (a) make the ship seaworthy; and (b) properly man, equip, and supply the ship.

## DISCUSSION

As we read the record, along with the elastic and equivocal findings of fact of the district court, there is overwhelming evidence that the appellees were in violation of 46 U.S.C. §§ 1303 and 1304 of COG-SA before and at the inception of the voyage in two respects:

(1) It is undisputed that the carrier failed to provide a proper Serto ferrule fitting in the low compression fuel joint that separated. It is also undisputed that the fitting had not been touched after the commencement of the voyage. This separation permitted the diesel oil to spray upon the hot generator parts, thus causing the fire. Moreover, the failure to use a flanged, rather than a compression joint in the fuel line is a clear violation of Lloyd's Rule, Chapter E, § 312.[2] The appellees' witness Seymour conceded that Rule E312 applied to the joint in question and that the joint was not flanged as required by the rule. There is no evidence that Lloyd's ever granted a variance of this rule. The fact that the district court said that compression joints on low pressure fuel lines were used on "many British ships" is of no importance. Mere compliance with a custom which falls below the United States' and Lloyd's standards is not sufficient. *See Texas & Pacific Railway Co. v. Behymer*, 199 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905 (1903); *Waterman Steamship Corp. v. Gay Cottons*, 414 F.2d 724, 738–39 (CA9 1969). Even appellees' own witness, Mr. Young, would not testify that Serto joints as used on the GLADIOLA were common. Appellees do not claim that the use of an Ermerto brand ferrule in a Serto brand fitting was proper. The lack of symmetry in the joint was obvious to appellant's witness, Mr. Walsh, and was noticeable to even the owners' high managerial representative, Mr. Cockrell.

(2) Furthermore, we hold that there is overwhelming evidence that there was lack of due diligence on the part of the appellees

---

1. It is specifically incorporated into the two bills of lading covering this particular shipment (Exhibits 1030, 1031) under Part A, § II, which reads:

"Paramount Clause. The Hague Rules contained in the International Convention for unification of certain rules relating to bills of lading, dated Brussels the 25th of August, 1924, as enacted in the country of shipment shall apply to this contract . . . ."

2. "Transfer, suction and other low pressure oil pipes and all pipes passing through oil storage tanks are to be made of cast iron or steel, having flanged joints suitable for a working pressure of not less than 7 KG/CM$^2$ (100 lb./in.$^2$). The flanges are to be machined and the jointing material is to be impervious to oil."

in their failure to man the vessel with a crew properly trained in engine room fire fighting. The engineers' reactions to the fire, including both their failure to utilize the proper equipment available to shut off the flow of oil spewing from the defective joint and their inability to properly utilize the portable fire extinguisher, indicated a lack of fundamental preparation and knowledge of the various means available to efficiently control this type of fire.

A case closely in point and misread by the district court is *Asbestos Corp., Ltd. v. Compagnie de Navigation*, 480 F.2d 669 (CA2 1973). There the vessel THE MARQUETTE suffered an engine room fire. Unlike the case at bar, there was no fault on the part of the owner with respect to the *cause of the fire*. The claimed unseaworthiness involved the location of the fire fighting equipment and its controls in the engine room. At trial, the owners contended that they could be liable only if their personal negligence caused the fire. The district court held for plaintiff. In speaking of the 1851 Fire Statute and the COGSA fire exemption, the appellate court said:

> "Appellants urge as to each a narrow reading of the exception to the exemption. Under their construction, a fire ignited because of lack of due diligence by the shipowner would result in liability, but failure to maintain equipment adequate to extinguish a nonnegligently ignited fire before it causes the damage would not. Judge Levet rejected this construction. *He held that an inexcusable condition of unseaworthiness of a vessel*, which in fact *causes the damage — either by starting a fire or by preventing its extinguishment* — will exclude the shipowners from the exemption of the Fire Statute and COGSA. *We agree.*" *Id.* at 672. [Emphasis supplied.]

The "*inexcusable* condition of unseaworthiness" mentioned in *Asbestos Corp.* no doubt refers to a condition of unseaworthiness where the carrier did not use due diligence. That is to say, *if the carrier used due diligence, the unseaworthiness would be excusable.*

True enough, the Second Circuit in speaking to both the Fire Statute and COGSA made the statement: "The burden of proof is on the carrier to show that he exercised due diligence. The fire exemption provisions merely *shift this burden of proof to the shipper. If the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused the damage.*" *Id.* at 672–673. [Emphasis supplied.] The use of this language was entirely unnecessary to the decision for the reason that the court had already affirmed the trial court's conclusion that the Marquette was unseaworthy because of her owners' failure to exercise due diligence." *Id.* at 672. We quote the key language of the district court opinion:

> "Minimal foresight, however, dictates that the engine room is [a] highly volatile compartment of a ship and the possibility of fire breaking out is ever present. *A shipowner must anticipate and provide for the contingency that a fire may break out in the engine room disabling all fire fighting equipment located in the engine room.* The owners of the Marquette through their 'design or neglect' and 'privity or knowledge' were negligent in placing all fire fighting equipment inside the engine room and failing to provide an emergency pump or fire system located or controlled from outside the engine room. This negligence on the part of the shipowners displays a total disregard for minimal protection of cargo and rendered the Marquette unseaworthy. *Under the circumstances this court concludes that the defendants-shipowners are not exempt from liability under COGSA § 1304(2)(b) or the Fire Statute.*" 345 F.Supp. 814 at 823. [Emphasis supplied.]

■ Our overlengthy analysis of the language in *Asbestos Corp.* is prompted by the casual treatment of the burden of proof by the author of the appellate court opinion. Although relying on COGSA, he completely

overlooks the language of §§ 1303(1) and 1304(1) which places the burden of showing due diligence to provide a seaworthy ship squarely on the shoulders of the carrier. It is this burden that appellees must overcome in order to invoke the exemptions of either § 1304(2)(b) or the Fire Statute.

In *Albina Engine & Machine Workers v. Hershey Chocolate Corp.*, 295 F.2d 619 (CA9 1961), we held that "neglect of the owner" under the Fire Statute refers to "the neglect of managing officers and agents as distinguished from that of the master or other members of the crew or subordinate employees." P. 621. In the case at bar, however, that distinction is immaterial. Here, the design or neglect was that of managing officers or supervisory employees, not that of the master or crew or subordinate employees. The "design or neglect" being the failure to provide a proper compression or flange joint and to properly man and equip a trained crew prior to the commencement of the voyage.

Our own court in *New York Mdse. Co. v. Liberty Shipping Corp.*, 509 F.2d 1249 (CA9 1975), has placed *Asbestos Corp.* in proper perspective. In *Liberty Shipping*, we held there was substantial evidence supporting the trial court's findings that the damage to the cargo resulted from the unseaworthiness of the vessel consisting of the incompetence of the master and the crew who were not properly trained in use of the vessel's fire fighting equipment. As in *Asbestos Corp.*, the cause of the fire which damaged the cargo was actually unknown. Here, we know that the cause of the fire was an improper ferrule. After reviewing the facts, Judge Merrill restated with approval what has been said many times, that fire is the peril most dreaded by mariners and one most difficult to combat in a fully laden ship. That being the fact, he agreed with the trial court that it was *incumbent upon the vessel's owners* to see that the master and the crew were fully trained in the operation and use of fire equipment.

In *Liberty Shipping*, the appellant contended that the district court's decision disregarded the owner's immunity from liability for damage to cargo caused by fire as granted by both the Fire Statute and by COGSA. The court in disposing of this contention quoted the same language cited *supra*, at page 1335, from *Asbestos Corp.*, and followed the quotation with the language: "In turn, we agree." The appellant there made essentially the same arguments as here made by the appellees. In response, the court said:

"Appellant next contends that the district court has, contrary to the statutory exemptions, placed upon the owner strict liability for the loss suffered by cargo. Appellant reasons that the court, by attributing responsibility for cargo damage jointly to the fire and to unseaworthiness, has placed upon the owner the traditional nondelegable duty to make the ship seaworthy and thus has imposed strict liability. The statutory exemptions, it is contended, do not permit the imposition of liability by nondelegable duty. Appellant relies on *Earle & Stoddart, Inc. v. Ellerman's Wilson Line, Ltd.*, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 . . . (1932) . . . ."

\* \* \* \* \* \*

"However, the district court's holding here was entirely consistent with *Earle & Stoddart*. COGSA provides, 46 U.S.C. § 1303(1):

'The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to—

(a) Make the ship seaworthy; . . . .'

In the case before us liability was not based on the traditional elements by which an owner is held liable for unseaworthiness of his vessel—those related to warranty and nondelegable duty. *Here there was owner neglect and actual fault constituting failure to exercise the due diligence required by COGSA through permitting the vessel to put to sea without having properly trained the master and crew in the use of fire-fighting*

*equipment and without having remedied deficiencies in the vent closing devices. Where the unseaworthy conditions that were the cause of the fire damage existed by reason of owner neglect or actual fault, the exemptions created by the Fire Statute and COGSA do not apply.*" 509 F.2d at 1251–52. [Emphasis supplied.]

Of more than ordinary significance is the fact that the *Liberty Shipping* court did not place upon the shipper the burden of proof on the issue of due diligence. To the contrary, *Liberty Shipping*, by the use of the language: "Here there was owner neglect and actual fault constituting failure to exercise *the due diligence* required by COGSA . . . .", clearly was referring to the due diligence required by COGSA in 46 U.S.C. §§ 1303(1) and 1304(1). In § 1304(1) the burden of proof is placed directly on the carrier by the following language: ". . . Whenever loss or damage has resulted from unseaworthiness, *the burden of proving the exercise of due diligence shall be on the carrier* or other persons claiming exemptions under this section." [Emphasis supplied.]

■ Appellees argue that the language "this section" ending the last sentence of paragraph 1, 46 U.S.C. § 1304(1) limits the vitality of the "due diligence" provision to that paragraph and does not apply to paragraph (2), the Fire Exemption Clause of COGSA. This contention is groundless. Appellees fail to recognize that the entire contents of 46 U.S.C. § 1304 were encompassed in "Section 4" of the initial legislation, 49 Stat. 1210. That the Congress was aware of the distinction between "paragraph" and "section" is made crystal clear by the use of the language "in accordance with the provisions of paragraph (1) of Section 3 of this title." This language is used in the same paragraph as the word "section" in "Sec. 4" of COGSA, now § 1304. Obviously, both paragraphs must be read and construed together.

3. The British Privy Council is the court of last resort for cases emanating from some of the Commonwealth Countries. When *THE MAU-*

Two Canadian cases, *Maxine Footwear Co., Ltd. v. Canadian Government Merchant Marine, Ltd.* [1959] A.C. 589; [1959] 2 Lloyd's List L.R. 105, [*THE MAURIENNE*]; and, *THE ANGLO–INDIAN*, [1944] A.M.C. 1407, are highly persuasive.

Involved in *THE MAURIENNE* is what we might term the Canadian COGSA. Like our own legislation, it was lifted almost word for word from The Hague Rules. The language of the Canadian COGSA with reference to the pertinent sections is almost identical with ours. Of no importance is the fact that the Canadian legislation used the word "Article," rather than the word "Section." Suggesting that the American Congress and the Canadian Parliament were working in unison is the fact that the Canadian Water Carriage of Goods Act was enacted in 1936, the same year that COGSA was enacted by the American Congress. The fact that the language "subject to the provisions of Article IV" appears at the beginning of Paragraph Two of Article III of the Canadian COGSA is of no importance here. The provisions of Article IV would be meaningless if they were not related to Article III. For comparison, we attach, as Appendix B, the equivalent Articles on the Canadian COGSA, corresponding to §§ 1303 and 1304(1) and (2).

In *THE MAURIENNE* an employee, under instruction from the master, caused a fire by applying a blow torch to cork insulation around certain pipes. The fire spread and resulted in the ship being scuttled, causing substantial loss to the appellant's cargo. The British Privy Council,[3] in construing the Canadian COGSA legislation and in holding the carrier liable for the damage caused by the fire said, among other things:

"This unseaworthiness caused the damage to and loss of appellants' goods. *The negligence of the respondents' servants which caused the fire was a failure to exercise due diligence.*

RIENNE was decided, decisions of the Canadian Supreme Court could be taken to the Privy Council.

"Logically the first submission on behalf of the respondents was that, in cases of fire, Art. III never comes into operation even though the fire makes the ship unseaworthy. All fires and all damage from fire on this argument fall to be dealt with under Art. IV, Rule 2(b).[4] If this were right, there was at any rate a very strong case for saying that there was no fault or privity of the carrier within that rule, and the respondents would succeed.

"In their Lordships' opinion the point fails. *Art. III, Rule 1,[5] is an overriding obligation. If it is not fulfilled and the non-fulfillment causes the damage, the immunities of Art. IV cannot be relied on.* This is the natural construction apart from the opening words of Art. III, Rule 2. The fact that that Rule is made subject to the provisions of Art. IV and Rule 1 is not so conditioned makes the point clear beyond argument." [1959] A.C. 589 at 602–603. [Emphasis supplied.]

The above holding provides a ready answer to appellees' contention that the language "Subject to the provisions of Art. IV" distinguishes the Canadian COGSA from the American COGSA. The language is contained in § 2 of Article III of the Canadian COGSA and makes no reference whatsoever to § 1 of the same Article which requires the carrier to make the ship seaworthy and to properly man and supply the ship. Congress in enacting the American COGSA merely eliminated the "subject to . . ." language as surplusage.

Another case interpreting the Canadian COGSA and holding that the Article IV (2)(b) (§ 1304(2)(b)) fire exemption was conditioned upon the exercise of due diligence under Article III (1) (§ 1303(1)) is *THE ANGLO–INDIAN,* [1944] A.M.C. 1407.

■ If not in conflict with our decisions, and they are not, we should follow the decisions of the Canadian authorities that have already interpreted The Hague Rules. *See Foscolo, Mango & Co., Ltd. v. Stag Line* [1932] A.C. 328; [1931] 41 Lloyd's List L.R. 165 (1931). It is there said "As these rules must come under the consideration of foreign courts, it is desirable in the interests of uniformity that their interpretation should not be rigidly controlled by domestic precedents of antecedent date, but rather that the language of the Rules should be construed on broad principles of general acceptation." *Id.* at 350; 174.

In speaking to the legislative history of COGSA, our Supreme Court in *Herd & Co., Inc. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), has said:

"The legislative history of the Act shows that it was lifted almost bodily from The Hague Rules of 1921, as amended by The Brussels Convention of 1924, 51 Stat. 233. The effort of those Rules was to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade." *Id.* at 301, 79 S.Ct. at 769.

That the district court in our case misinterpreted the significance of the decision of the Canadian court in *THE MAURIENNE* is clearly demonstrated by its conclusion:

"The plaintiff's reliance on the Canadian authority of *Maxine Footwear Company v. Canadian Government Merchant Marine,* [1959] 2 Lloyd's Rep. 105, is misplaced. Although the Court in that case did place the burden of proving initial seaworthiness on the carrier, that case was dealing with a Canadian statute fashioned on the Hague Rules."

Manifestly, the district court overlooked the fact that COGSA was also fashioned on The Hague Rules.

Having some bearing on our problem is *Waterman Steamship Corp. v. Gay Cottons,* 414 F.2d 724 (CA9 1969), a case in which the shipowner sought limitation of liability un-

---

**4.** 46 U.S.C. § 1304(2)(b).

**5.** 46 U.S.C. § 1303(1).

der the provisions of the Limitation of Liability Act, 46 U.S.C. § 183(a). There, the court held that the captain's negligent failure to have the fathometer checked at the next port after the third mate told him it was inoperative did not support a denial of limitation of liability by the owner. It is noted that there was no showing that the fathometer was defective "before and at the beginning of the voyage." The following language of the court's opinion is relevant:

> "Under COGSA, 46 U.S.C. § 1304, the lack of *due diligence of any employee which occurs before or at the beginning of a voyage and results in unseaworthiness is sufficient to preclude complete exoneration of liability.*" *Id.* at 728. [Emphasis supplied.]

The court then went on to discuss the meaning of the language "privity or knowledge" within the meaning of Limitation of Liability Act, 46 U.S.C. § 183(a), and then said:

> "*We conclude that standards under the Limitation Act are different from those under COGSA.* The shipowner [under the Limitation Act] is entitled to limitation of liability if it can show that the lack of due diligence is not within its 'privity or knowledge.'" *Id.* at 731. [Emphasis supplied.]

Thus, by implication, it held that the same standard would not apply under COGSA. This is consistent with our holding that the due diligence required "before and at the beginning of the voyage" under COGSA § 1303 cannot be avoided by the "carrier" by either asserting lack of "privity or knowledge" or the exemptions of § 1304(2). Clearly, an owner cannot close its eyes to what prudent inspection would disclose. *Waterman Steamship Corp. v. Gay Cottons, supra,* at 739.

Despite appellees argument to the contrary, we do not believe the provisions of Section 8 of the original COGSA, 46 U.S.C. § 1308, invalidates or in any manner affects COGSA's requirements that the carrier shall be bound to *exercise due diligence* to make the ship seaworthy. Section 1308 provides that the provisions of the legislation shall not affect the rights and obligations of the carrier under the Fire Statute and other legislation. As we have already said, the Fire Statute must be read in the light of COGSA, the more recent legislation. In *New York Mdse. Co. v. Liberty Shipping Corp.,* 509 F.2d 1249 at 1251–52, we held that an owner could not rely upon either fire exemption unless the owner had exercised the due diligence required by COGSA. To construe Section 8 in conformity with appellees' contention would nullify the language of Sections 3 and 4, 46 U.S.C. §§ 1303 and 1304, dealing with due diligence and the burden of proof, and render meaningless the positive language these sections added to the prior legislation.

## APPELLEES' AUTHORITIES

The cases cited by the appellees involved either fires resulting from the carrier's failure to properly and carefully load, handle, stow, carry, care for and discharge the goods carried as required by Section 3, Paragraph 2, of COGSA, 46 U.S.C. § 1303(2), or decisions made prior to the effective date of COGSA.

The decisions with reference to fire caused by negligent stowage are of no help on our facts. COGSA treats the responsibility for stowage separately and distinct from the responsibility of providing a seaworthy ship and to properly man, equip and supply the ship. A casual reading of Section 3 reveals this distinction. In other words, the failure to properly stow the goods has nothing to do with the failure to make the ship seaworthy or the failure to properly man, equip, and supply the ship. Section 4(1) of COGSA, speaking to the burden of proof and the exercise of due diligence, specifically mentions Paragraph 1 of Section 3 with reference to unseaworthiness and to properly man and equip the ship but makes no reference whatsoever to the stowage provisions of Paragraph 2 of Sec-

tion 3. Consequently, the "due diligence" and "burden of proof" provisions of Sections 3 and 4 of COGSA are not applicable to Paragraph 2, the stowage provisions of Section 3.

Typical of appellees' cases is *A/S J. Ludwig Mowinckels Rederi v. Accinanto, Ltd.,* 199 F.2d 134 (CA4 1952), which involved a fire and explosion resulting from spontaneous combustion in the cargo. True enough, the defendants sought to invoke the protections of the Fire Statute and the COGSA fire exemption. It is clear, however, that the court was primarily concerned with deciding whether the cargo had been stowed negligently by the stevedore. There was only a limited mention of the COGSA Fire Exemption, § 1304(2)(b), the case being principally concerned with the stowage. In reading these cases, we must keep in mind that the Limitation of Liability Act (46 U.S.C. §§ 181–189) was there directly involved, while COGSA was not. Whatever the *Accinanto* court said with reference to the COGSA Fire Exemption would not control us here in that the provisions of Section 3(1) and Section 4(1) of COGSA were not in issue.

Another case cited by appellees which involved improper stowage of goods is *Automobile Ins. Co. v. United Fruit Co.,* 224 F.2d 72 (CA2 1955). But there the Second Circuit affirmed the district court's holding that plaintiffs had failed to show that the fire was caused by the cargo of bleaching powder much less by any improper stowage of that cargo. Again, Section 3(1) and Section 4(1) of COGSA were not properly before the court. Citing *Accinanto, supra,* the court continued the dictum that the purposes of the 19th Century Fire Statute and the COGSA Fire Exemption were the same. Neither case recognizes that the Limitation of Liability Act of which the Fire Statute was a part, was designed solely for the benefit of the shipowner. It is undisputed that the purpose of COGSA was to upgrade the protection afforded the cargo owners and downgrade the protection afforded the interests of the shipowners and charterers.

Another case involving improper stowage which caused a fire cited by appellees is *American Tobacco Co. v. The Katingo Hadjipatera,* 81 F.Supp. 438 (S.D.N.Y.1948), modified, 194 F.2d 449 (CA2 1951). That case focused almost exclusively upon the Fire Statute with but passing reference to COGSA. *See* 81 F.Supp. at 446. In any event, the decision of the district court was nullified when the court of appeals held that the stowage of the cargo was not negligent.

Appellees cite *Earle & Stoddart, Inc. v. Ellerman's Wilson Line, Ltd.,* 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932), in support of their theory. However, the case was decided in 1932, some four years before the enactment of COGSA. Again, this was a stowage case. The owners sought exoneration under the 19th Century Fire Statute. There, the cargo owners relied upon several cases interpreting Section 3 of the Harter Act, 46 U.S.C. § 192, which contains a number of the exemptions now included in COGSA, Section 4(2). Those cases held that the immunities in Section 3 of the Harter Act were granted only if *the carrier first established* that all of its employees exercised due diligence to make the vessel in all respects seaworthy. The Supreme Court affirmed the holding of those cases, but observed that Section 3 of the Harter Act did not contain an immunity for fire liability and, therefore, did not create any general duty of due diligence on the part of the shipowners which would condition immunity under the Fire Statute. 287 U.S. at 426–27, 53 S.Ct. 200. From our analysis it is clear that COGSA has made due diligence under § 1303(1) a prerequisite to claiming any exemption under § 1304(2), and fire is included within these exemptions.

## DEVIATION

█  Our examination of the record convinces us that the trial judge's finding that the Guayaquil call was not an unreasonable deviation is not clearly erroneous. In light of our holding, we need not decide whether

our pre-COGSA decision in the *Hermosa,* 57 F.2d 20, 27 (CA9 1932), correctly allocates the burden of proof on the issue of whether an unreasonable deviation contributed to a particular loss under 46 U.S.C. § 1304(4).

## CONCLUSION

We adopt, as the law of our circuit, the construction placed on The Hague Rules by their Lordships in *THE MAURIENNE,* and hold that the provisions of Section 3, Paragraph 1, COGSA, create an overriding obligation and if that obligation is not fulfilled and the nonfulfillment causes the damage, the fire immunity of Section 4, Paragraph 2(b), cannot be relied upon by appellees. This overriding obligation to exercise due diligence to: (a) make the ship seaworthy, and (b) properly man, equip, and supply the ship applies to the master and those in the management of the ship, as well as to the owners or charterers personally, or those who act for the owners in a managerial capacity. For non-application of the Fire Statute, *see Liberty Shipping, supra,* at 1251–52.

Our analysis of the record convinces us that the appellees also failed to carry their burden of proof on the issue of exercising due diligence to make the ship seaworthy as required by Section 4, Paragraph 1, 46 U.S.C. § 1304(1). Consequently, the district court's findings of fact rested upon an erroneous view of the law as expressed in its conclusions. It is practically conceded that the improper ferrule in place at the commencement of the voyage, permitted the volatile diesel oil to spray on the generators and thus was the proximate cause of the damage resulting from the fire. Moreover, as in *Asbestos Corp.,* it was not "crew negligence" that either started the fire or prevented its extinguishment, but a failure to properly train the crew in what to do in case of engine room fires and in the use of fire fighting equipment. This unperformed obligation required by Section 3(1)(b) also was a cause of the damage. Therefore, the overall cause of the breakdown of the ves-

sel's refrigeration equipment, which forced the appellant to donate the cargo of citrus fruit to the Ecuadorian government, was the failure of the appellees to fulfill their obligations as required by COGSA. It was not the fire. Accordingly, the findings, conclusions, and judgment of the district court are set aside and the cause remanded for further proceedings in conformity with our conclusions, including the entry of an appropriate judgment in favor of appellant.

IT IS SO ORDERED.

## APPENDIX A

For example: (1) the addition of fire to the exemptions of the Harter Act, Article 4, Par. 2, 51 Stat. 251 [46 U.S.C. § 1304(2)(b)]; (2) the burden of proof on the exercise of due diligence by the carrier, Article 4, Par. 1, 51 Stat. 251 [46 U.S.C. § 1304(1)]; and, (3) the due diligence required of the carrier "before and at the beginning of the voyage.", Article 3, Par. 1, 51 Stat. 249 [46 U.S.C. § 1303(1)].

## APPENDIX B

The material portions of the Canadian Water Carriage of Goods Act provide:

"Article III.

RESPONSIBILITIES AND LIABILITIES—

1. The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to,

(a) make the ship seaworthy;

(b) properly man, equip, and supply the ship;

(c) make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

2. Subject to the provisions of Article IV, the carrier shall properly and carefully load, handle, stow, carry, keep, care for and discharge the goods carried.

"Article IV.

RIGHTS AND IMMUNITIES

1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, and to make the holds, refrigerating and cool chambers and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of paragraph 1 of Article III.

"Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this section.

"2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from, . . .

"(b) fire, unless caused by the actual fault or privity of the carrier;"