93 F.3d 641
 1996 A.M.C. 2409, 96 Cal. Daily Op. Serv. 6235,
96 Daily Journal D.A.R. 10,171
 NISSAN FIRE & MARINE INSURANCE COMPANY, LTD.; Taiko Bussan
Kaisha, Ltd., Plaintiffs-Appellees,
v.
M/V HYUNDAI EXPLORER, her engines and appurtenances, etc.;
Hyundai Merchant Marine Company, Ltd.,
Defendants-Appellants.
FIREMAN'S FUND INSURANCE COMPANIES, a corporation; American
Home Assurance Co., a corporation, Plaintiffs-Appellees,
v.
M/V HYUNDAI EXPLORER, her engines, tackle, machinery, etc.;
Hyundai Merchant Marine Company, Ltd.,
Defendants-Appellants.
 Nos. 95-15092, 95-15094.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 11, 1996.
Decided Aug. 21, 1996.
 
 Eric Danoff, Graham & James, San Francisco, California, for defendants-appellants.
 Marilyn Raia, Derby, Cook, Quinby & Tweedt, San Francisco, California; David Danielson, Danielson, Harrigan & Tollefson, Seattle, Washington, for plaintiffs-appellees.
 Appeals from the United States District Court for the Northern District of California, Charles A. Legge, District Judge, Presiding. D.C. Nos. CV-93-02586-CAL, CV-92-04659-CAL.
 Before: HUG, Chief Judge, D.W. NELSON and FERNANDEZ, Circuit Judges.
 D.W. NELSON, Circuit Judge.
 
 I.
 INTRODUCTION
 
 1
 This case arises out of an engine room fire aboard the M/V HYUNDAI EXPLORER (the "Vessel"), a Korean flag container cargo ship, on or about January 2, 1992. Defendant-appellant Hyundai Merchant Marine Co., Ltd. ("HMM"), the bareboat charterer[1] and operator of the Vessel when she experienced the fire, appeals the district court's grant of summary judgment for plaintiffs-appellees Nissan Fire & Marine Insurance Co., Ltd., Taiko Bussan Kaisha, Ltd., Fireman's Fund Insurance Co. and American Home Assurance Co., (collectively, "Cargo Interests"). Cargo Interests are the subrogated insurers or consignees of cargo that suffered damage because of the fire. We reverse the summary judgment for Cargo Interests and remand to the district court with instructions to enter judgment for HMM.
 
 II.
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 The parties stipulated to most of the relevant facts in their Agreed Statement of Facts, which they filed with the district court. During the voyage at issue, the Vessel loaded and discharged cargo at Long Beach, Oakland and Seattle. It departed Seattle for Pusan, Korea on December 22, 1991. During the cargo operations in the United States ports and on the voyage to Korea, both of the Vessel's generators operated with no apparent problems until a fire was discovered on the morning of January 2, 1992.
 
 
 3
 The Vessel has an automated control room and was therefore manned only between 0800 and 1730 hours. The Third Engineer, who was the duty officer on the night of January 1, noted nothing out of the ordinary when he visited the engine room at 2200 hours as part of his routine. At 0700 hours on January 2, however, an alarm alerted him to a fire in the engine room. Although the crew was able to extinguish the fire, the engine control room sustained significant damage, and the Vessel required a salvage tug to tow her to Pusan. While under tow, she was unable to provide refrigeration to the refrigerated ("reefer") cargo, and much of it spoiled.
 
 
 4
 The fire resulted from the failure of a compression coupling on a fuel oil line to the No. 2 generator fuel pressure alarm. When the coupling failed, the line separated from the main fuel line and sprayed oil, which ignited when it contacted the engine exhaust system. The line was not original, but had been replaced at some unknown time in the past. Inspection of the coupling indicated that it was not defective, but that it had been improperly fitted. Inspection also revealed that a rubber "O" ring and some thread sealing tape were attached to the coupling. Presumably, the ring and tape were used to repair a previous leak, but it is not known when they were applied.
 
 
 5
 Both parties' expert witnesses opined that the repair to the coupling was of the type normally performed by a crewmember and that the curves on the replacement line indicated that a crewmember, rather than a shipyard, most likely made the repair in question. None of the engineers aboard at the time of the fire, each of whom had joined the Vessel between March and August, 1991, fitted the coupling in question or had ever seen the coupling leak. Only the engine room log books and maintenance records might have reflected repairs made by prior crew members, and these were destroyed in the fire.
 
 
 6
 While assembled, the coupling completely concealed the "O" ring, sealing tape and its poor fit. Indeed, both experts agreed that the defective fitting would not have been visually apparent to even a trained engineer or surveyor while assembled. Moreover, Cargo Interests' expert testified that engineers and surveyors normally do not open compression couplings in an engine room for inspection purposes and that disassembly is not part of routine maintenance or inspection. These observations held true in this case as HMM's port engineer in charge of the Vessel's maintenance and repair failed to discover the defect in the coupling assembly before the Vessel departed on the voyage in issue.
 
 
 7
 In addition, official inspections of the Vessel had failed to discover the defective coupling if, in fact, it existed when they were performed. The Vessel is certified ("classed") by the Korean Register of Shipping ("KRS"), which inspects vessels' safety for governmental insurance purposes. In September, 1990, the KRS surveyed the Vessel's No. 2 generator and its safety devices and alarms and found them to be in order. The KRS made another hull/machinery survey in August, 1991 and issued a report stating that it had inspected the safety devices and alarms for the generators and again found them to be in order. The No. 2 generator was next due for survey in 1995.
 
 
 8
 Cargo Interests brought suit against the Vessel and HMM for damages they incurred due to the spoiled reefer cargo. This case originally was brought as two separate suits, each against HMM in personam as claimant to the Vessel and against the Vessel in rem. After the cases were consolidated, the district court heard the parties' cross motions for summary judgment. HMM moved for summary judgment on the basis of its assertion that the "fire defenses" insulated it from liability. The fire defenses are comprised of two statutes that limit a shipowner's liability for cargo damage caused by fire aboard a vessel: the "Fire Statute," 46 U.S.C.App. § 182,[2] and the COGSA Fire Exemption, 46 U.S.C.App. § 1304(2)(b).[3]
 
 
 9
 The court determined, and HMM concedes, that the defective coupling responsible for the fire was an unseaworthy condition. The court then ruled that under the law of this Circuit, HMM had the burden of proving it had exercised due diligence to make the Vessel seaworthy before it could invoke the fire defenses. Further, the district court held that HMM's duty of due diligence was "absolute or non-delegable" and that HMM had failed to meet its burden. We reverse.
 
 III.
 STANDARD OF REVIEW
 
 10
 We review de novo summary judgment rulings. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). Under de novo review, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 IV.
 DISCUSSION
 
 11
 A. Burden of proof on due diligence.
 
 
 12
 "Fire is the peril most dreaded by all mariners, and a peril most difficult to combat in a fully laden ship." In re Liberty Shipping Corp., 509 F.2d 1249, 1250 (9th Cir.1975). That being so, the maritime law has developed unique provisions embodied in the fire defenses which govern a shipowner's liability in connection with a fire aboard his vessel. This court has held, however, that where unseaworthiness[4] caused the fire, a carrier[5] bears the burden of showing that it exercised due diligence to make the ship seaworthy before it can invoke the fire defenses to exonerate it from liability. See Sunkist Growers, Inc. v. Adelaide Shipping Lines, 603 F.2d 1327, 1340 (9th Cir.1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980); cf. In re Damodar Bulk Carriers, Ltd., 903 F.2d 675, 686 (9th Cir.1990). Because the improperly fitted coupling on the Vessel was an unseaworthy condition, the district court correctly assigned to HMM the burden of proving its due diligence as a prerequisite to invoking the fire defenses.
 
 
 13
 B. The standard of due diligence under the fire defenses.
 
 
 14
 HMM contends that even if it bore the burden of showing that it acted with due diligence, the district court erred in holding that this duty was non-delegable.[6] Cargo Interests contend that the court imposed the proper standard and that HMM's duty of due diligence was in fact non-delegable.
 
 
 15
 This claim is without merit and manifests Cargo Interests' failure to recognize the different standards of due diligence that apply in the fire defenses and other COGSA exemptions. While the carrier's duty of due diligence is non-delegable for exoneration under the non-fire COGSA exemptions, a different standard of due diligence, one derived from the Fire Statute, governs fire cases and eliminates vicarious liability imputed to the carrier. Under the fire defenses, a carrier is liable only for "his personal negligence, or in case of a corporate owner, negligence of its managing officers and agents as distinguished from that of the master or subordinates." Consumers Import Co. v. Kabushiki Kaisha, 320 U.S. 249, 252, 64 S.Ct. 15, 16, 88 L.Ed. 30 (1943); see also Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 427, 53 S.Ct. 200, 201, 77 L.Ed. 403 (1932) ("The courts have been careful not to thwart the purpose of the fire statute by interpreting as 'neglect' of the owners the breach of what in other connections is held to be a non-delegable duty."); Westinghouse Elec. Corp. v. M/V "LESLIE LYKES", 734 F.2d 199, 209 (5th Cir.), cert. denied, 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984); Hasbro Indus. v. M/S St. Constantine, 705 F.2d 339, 342 (9th Cir.1983) (holding that the negligence of the "shipowner's supervisory or managing employees" was sufficient to find personal negligence); In re Ta Chi Navigation Corp., S.A., 677 F.2d 225, 228 (2d Cir.1982) (" 'Neglect' ... means negligence, not the breach of a non-delegable duty."); Sunkist, 603 F.2d at 1336 (stating that " 'neglect of the owner' under the Fire Statute refers to 'the neglect of the managing officers and agents as distinguished from that of the master or other members of the crew' ") (quoting Albina Engine & Machine Works v. Hershey Chocolate Corp., 295 F.2d 619, 621 (9th Cir.1961)); In re Liberty Shipping Corp., 509 F.2d 1249, 1252 (9th Cir.1975); Asbestos Corp. Ltd. v. Compagnie De Navigation Fraissinet et Cyprien Fabre et al., 480 F.2d 669, 673 n. 7 (2d Cir.1973).
 
 
 16
 Although a carrier generally is not liable for the negligence or lack of due diligence of its crew or other lower level employees, it still may be liable for the actions of an employee responsible for starting the fire or preventing its spread if the carrier was personally negligent, for example, by not adequately training the employee or by failing to provide sufficient fire fighting equipment. See, e.g., Hasbro, 705 F.2d at 342; Asbestos Corp., 480 F.2d at 672. Under the facts of this case, however, there was nothing to implicate the crew's training, the Vessel's fire-fighting equipment, or any other personal duties of HMM. The district court improperly focused on the unseaworthy condition rather than assessing whether any personal negligence by HMM was responsible for that condition. As we have discussed above, however, the fire defenses impose a burden of personal due diligence. Because the district court applied the wrong standard of due diligence in determining whether HMM had carried its burden, the court erred in granting summary judgment for Cargo Interests.
 
 C. Proving due diligence
 
 17
 Exoneration under the fire defenses is not voided by an unseaworthy condition, but rather by an "inexcusable" unseaworthy condition, i.e., one that existed because of the carrier's lack of due diligence. See Hasbro, 705 F.2d at 341; Sunkist, 603 F.2d at 1335 (quoting Asbestos Corp., 480 F.2d at 672). To carry its burden of proving due diligence, HMM had to prove that it had done all that was "proper and reasonable" to make the Vessel seaworthy. See Martin v. The Southwark, 191 U.S. 1, 15-16, 24 S.Ct. 1, 5-6, 48 L.Ed. 65 (1903). All of the evidence indicates that a crewmember made the repair in question; indeed, Cargo Interests' expert witness agreed with that assessment. Because the facts do not suggest any theory under which the defective repair could be imputed to HMM personally, it is irrelevant whether HMM can identify the specific circumstances surrounding the repair.
 
 
 18
 The evidence also demonstrates that HMM inspected the Vessel and/or had it inspected regularly. We are aware that compliance with classification society requirements does not necessarily establish due diligence. See Louis Dreyfus Corp. v. 27,946 Long Tons of Corn, 830 F.2d 1321, 1327 (5th Cir.1987); Fireman's Fund Ins. Cos. v. M/V VIGNES, 794 F.2d 1552, 1556 (11th Cir.1986). Nevertheless, the testing of the Vessel in accordance with classification society requirements is a factor tending to prove due diligence. The failure of regular KRS surveys of the engine room and generators to reveal any problems with the coupling provides strong evidence of HMM's due diligence because it shows how difficult it would have been to detect the unseaworthy condition and that HMM was not on notice of any problem concerning the coupling. The undisputed evidence indicates that the coupling had functioned without leaking for at least the previous nine months and that the defective assembly was hidden from even a trained eye.
 
 
 19
 There is no evidence that the defect could have been discovered without disassembly of the coupling. Even the Cargo Interests' own expert testified that disassembly of the coupling is normally not a part of routine inspections. There is no credible evidence that could establish the personal lack of due diligence by HMM. Therefore, we hold that HMM carried its burden of proving due diligence and that the defectively repaired coupling was an excusable condition of unseaworthiness.
 
 V.
 CONCLUSION
 
 20
 The fire defenses do not hold shipowners or other carriers liable for an unseaworthy condition that contributed to a vessel fire unless that unseaworthy condition was preventable by the carrier in the exercise of due diligence. We are satisfied that HMM has carried its burden of proving its due diligence to make the Vessel seaworthy. Unfortunately for Cargo Interests, the defectively repaired coupling was the sort of rare condition that was not remedied despite the exercise of due diligence. For the foregoing reasons, we reverse the district court's grant of summary judgment for Cargo Interests and remand to the district court with instructions to enter judgment for HMM.
 
 
 21
 REVERSED and REMANDED.
 
 
 
 [1]
 A bareboat charterer is one who charters or leases a vessel without a crew. The charterer assumes full possession and control of the vessel and is deemed the owner of the vessel for purposes of the U.S. Carriage of Goods by Sea Act ("COGSA") during the period of the charter. 46 U.S.C.App. § 186
 
 
 [2]
 46 U.S.C.App. § 182 [the Fire Statute], enacted as part of the original Limitation of Liability Act of 1851, provides:
 No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner.
 
 
 [3]
 Congress enacted COGSA in 1936 to partially replace the Harter Act of 1893, 46 U.S.C.App. §§ 190-196, and to make the law more favorable to shipowners. See In re Damodar Bulk Carriers, Ltd., 903 F.2d 675, 684 (9th Cir.1990). 46 U.S.C.App. §§ 1303 and 1304, part of COGSA, provide in relevant part:
 § 1303. Responsibilities and liabilities of carrier and ship
 Seaworthiness
 (1) The carrier shall be bound, before and at the beginning of the voyage, to exercise due diligence to--
 (a) Make the ship seaworthy;
 (b) Properly man, equip, and supply the ship;
 § 1304. Rights and immunities of carrier and ship
 Unseaworthiness
 (1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied.... Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.
 Uncontrollable causes of loss
 (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from--
 (b) Fire, unless caused by the actual fault or privity of the carrier.
 
 
 [4]
 The legal test for seaworthiness is "whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport." The Silvia, 171 U.S. 462, 464, 19 S.Ct. 7, 8, 43 L.Ed. 241 (1898). Courts have held that a broad range of conditions may render a vessel unseaworthy: crew error, a defect in the vessel's construction or equipment, improper loading or stowage of cargo and various sorts of dangerous conditions
 
 
 [5]
 "The term 'carrier' includes the owner or the charterer who enters into a contract of carriage with the [cargo] shipper." 46 U.S.C.App. § 1301(a). In this case, HMM is the carrier and Cargo Interests are the shippers
 
 
 [6]
 The court stated at the hearing on the cross motions for summary judgment:
 [T]he shipowner has this duty of putting the vessel in a seaworthy condition at the beginning of the voyage.
 So we do not really have an issue of whether the shipowner is being held vicariously liable for the act of the crew, as this was a condition of the vessel at the time that it embarked upon the voyage. And this was the duty of the shipowner.
 And whether one calls it ... absolute or nondelegable, or whatever term you use, it is a duty that the shipowner owed where I don't think it's entitled to step behind the, quote, no liability for the acts of the crew, close quote, principle....