903 F.2d 675
 1990 A.M.C. 1544
 In the Matter of the Complaint of Petitioner DAMODAR BULK
CARRIERS, LTD., as Owner and Operator of the M/V
DAMODAR TANABE for exoneration from or
limitation of liability.
PEOPLE'S INSURANCE COMPANY OF CHINA; China National Light
Industrial Products Import and Export Corporation,
Plaintiffs/Appellants/Cross-Appellees,
v.
M/V DAMODAR TANABE, her engines, tackle, equipment, apparel,
etc., in rem; Damodar Bulk Carriers, Ltd., Gerrard
Chartering Co. A/S, Celulosa Arauco y Constitucion, S.A.,
Cia. Chilena de Navegacion Interoceanica, S.A., Atlas
Shipping Co., Defendants/Appellees/Cross-Appellants.
 Nos. 88-15529, 88-15530 and 88-15559.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 2, 1989.
Decided May 10, 1990.
 
 Donald P. Swisher, Garvey, Schubert & Barer, Seattle, Washington, for plaintiffs/appellants/cross-appellees.
 Eugene J. O'Connor, Peter J. Gutowski, Freehill, Hogan & Mahar, New York City, David W. Proudfoot, Nenad Krek, Case & Lynch, Honolulu, Hawaii, for defendants/appellees/cross-appellants.
 Appeal from the United States District Court for the District of Hawaii.
 Before SNEED, KOZINSKI and THOMPSON, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 A fire aboard the bulk carrier M/V DAMODAR TANABE sparked this litigation between an insurer of cargo and carriers of the goods. People's Insurance Company of China ("PICC"), subrogated to appellant China National Light Industrial Products Import and Export Corporation ("China Light"), brought suit in admiralty against Cia. Chilena de Navegacion Interoceanica, S.A. ("CCNI"), Atlas Shipping Co. ("Atlas"), Damodar Bulk Carriers, Ltd. ("DBC"), and Celulosa Arauco y Constitucion, S.A. ("Celulosa"). Representing the cargo interests, PICC sued the vessel, its owner, and its sub-charterers for damages to the wood pulp cargo damaged by the fire. The district court found that the pulp as loaded constituted a high risk cargo, and that the ship was unseaworthy to carry the wood pulp without a fixed carbon dioxide (CO2 ) firefighting system in the cargo holds to control the fire. The court imposed on the cargo plaintiffs the burden of proving that a CO2 system would have prevented the need to flood the hold to control the fire. Unable to resolve this fact question, the court held the defendants not liable and ruled in favor of DBC's counterclaim for general average contribution from the cargo plaintiffs. PICC, DBC, and CCNI/Atlas appeal this decision.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 2
 Appellant China Light[1] was the purchaser and consignee of 25,000 metric tons of wood pulp from Celulosa, a Chilean corporation. The purchase contracts required Celulosa to arrange ocean transportation from Chile to China and to inform China Light of the transshipment details. Celulosa contracted with CCNI, a Chilean shipping line, which chartered space on board the DAMODAR TANABE under an agreement with appellee Atlas. Atlas in turn sub-chartered the ship under a time charter for this voyage from Gerrard Chartering Company ("Gerrard"), which had previously time chartered the vessel from appellee DBC. The head charter agreement between DBC and Gerrard stated that the vessel was not CO2 -fitted, but this provision, omitted from the Gerrard-Atlas sub-charter, was never communicated to China Light.
 
 
 3
 The DAMODAR TANABE, a bulk carrier chartered to carry wood pulp in six of its seven holds from Lirquen, Chile, to China via Hawaii and Japan, issued clean bills of lading acknowledging receipt of the cargo in apparent good condition prior to sailing on December 18, 1984. Receipts of the ship's mate, however, noted that stowage of the wood pulp was improper, and the problem was never corrected. Pressed into sheets, the wood pulp was packed in bales, which in turn were lashed together and stacked in the holds. Stowage of the bales left gaps between stacks, permitting the cargo to shift and chafe. This rubbing and slippage produced tinder-like flock in the holds.
 
 
 4
 After a bunkering call at Honolulu, the ship proceeded toward Japan. On January 18, 1985, when the ship was halfway to Miyako, crewmen discovered fire in hold number 3. The crew unsuccessfully fought the blaze at first with hoses inserted through the ventilators before flooding the hold to a depth of 4.5 meters. As the wood pulp swelled from the water, the hatch covers raised up, exposing the pulp to oxygen and ocean spray. The increase in smoke and fire from this exposure necessitated further flooding of the hold, this time to ten to eleven meters.
 
 
 5
 At 3:45 A.M. on January 19, 1985, the master turned about and set a course for Honolulu as a refuge port. After some seventy-five hours from the first sign of smoke, the crew succeeded in arresting the fire. The ship reached Oahu on January 24, 1985. By one account, the fire damaged the cargo far less (5%) than did the water used to extinguish it (95%). The master discharged a portion of the wood pulp in hold number 3 in Hawaii and sold it for salvage. He discharged the remainder in Japan; none reached China.
 
 
 6
 The district court, in admiralty, heard this action in rem against the DAMODAR TANABE and in personam against the other defendants. Sitting without a jury, the court found that "hold number 3, as loaded, contained highly combustible cargo." (Emphasis added.) The court concluded that the defendants had not carried their burden of proving that "due diligence was used to make the vessel seaworthy [because] the exercise of due diligence required a fixed CO2 system." Nevertheless, the court could not determine the cause of the fire or whether the unseaworthiness caused the damage to the cargo. Based on the evidence, the court was "unable to determine whether a CO2 system properly installed in the holds would have suppressed or extinguished the fire in time to make it unnecessary to flood number 3." The court thus found "against the party upon whom the law places the burden of proof" and entered judgment in favor of appellees on their counterclaim for general average.
 
 
 7
 The court determined that the plaintiff cargo interests had the burden of proving that the unseaworthiness (the lack of the CO2 system) caused the damage under the Carriage of Goods By Sea Act, 46 U.S.C.App. Sec. 1304(1) (1982 & Supp. V 1987). "Basing my decision solely upon my allocation of the burden of proof, I find that the plaintiffs failed to prove that the unseaworthiness was the cause of the damage in hold number 3." Plaintiffs also sustained damage to wood pulp caused by wetting in holds numbered 1, 2, 4, 6, and 7. The court determined that defects in the ship itself caused these damages, and held defendants liable for $70,171.89, along with prejudgment interest of seven percent per annum from February 15, 1985.
 
 
 8
 By requiring the plaintiffs, who were without fault, to contribute to the general average, the court's ruling made the defendants the prevailing parties. Accordingly, the court entered judgment in favor of DBC and against PICC and China Light for $327,499.07, plus interest at seven percent per annum from September 30, 1987, for general average. PICC, DBC, and CCNI/Atlas appeal this judgment.
 
 II.
 JURISDICTION
 
 9
 The cargo interests brought this suit in admiralty under 28 U.S.C. Sec. 1333 (1982). On three different occasions, each time before a different judge, CCNI/Atlas unsuccessfully raised personal jurisdiction objections. The last time, however, Judge Smith[2] was more sympathetic to its argument, but nevertheless rejected it.[3]
 
 
 10
 The district court's reservations notwithstanding, the longstanding custom in American admiralty law is that courts have discretion to assert in personam jurisdiction in suits between foreign parties. See, e.g., THE BELGENLAND, 114 U.S. 355, 368-69, 5 S.Ct. 860, 866, 29 L.Ed. 152 (1885); Poseidon Schiffahrt, G.M.B.H. v. M/S NETUNO, 474 F.2d 203, 204 (5th Cir.1973). The tactic employed by the foreign defendants in this suit is somewhat unusual, however, because most such defendants challenge the admiralty court's authority to hear suit under the doctrine of forum non conveniens.[4] Here appellees CCNI/Atlas challenge personal jurisdiction not under the forum non conveniens doctrine, but on due process grounds. Unlike a forum non conveniens attack, which we review for abuse of discretion, we review de novo a personal jurisdiction challenge. Pacific Atlantic Trading Co. v. M/V MAIN EXPRESS, 758 F.2d 1325, 1326 (9th Cir.1985) (citing Cubbage v. Merchent, 744 F.2d 665, 667 (9th Cir.1984), cert. denied, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985)).
 
 
 11
 A proper exercise of "[p]ersonal jurisdiction requires a two-part showing: (1) that the forum state has an applicable statute conferring jurisdiction on nonresidents, and (2) that the assertion of jurisdiction under the statute comports with constitutional requirements of due process." Jenkins v. Whittaker Corp., 785 F.2d 720, 723 (9th Cir.), cert. denied, 479 U.S. 918, 107 S.Ct. 324, 93 L.Ed.2d 296 (1986).
 
 
 12
 Both this court and the Hawaii Supreme Court have held that "Hawaii law gives jurisdiction to the full extent allowed by the Constitution...." Jenkins, 785 F.2d at 723 (citing Cowan v. First Ins. Co. of Haw., 61 Haw. 644, 649, 608 P.2d 394, 399 (1980)). We need thus determine only whether personal jurisdiction over the appellees comports with due process.
 
 
 13
 We begin our analysis at a familiar starting point. To evaluate a due process challenge to the exercise of personal jurisdiction one must determine whether a defendant has certain "contacts, ties, or relations" in a state for a judgment to be binding. International Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95 (1945).[5] The Supreme Court in turn has elaborated on this concept by identifying two forms of personal jurisdiction, general and specific. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 n. 10, 104 S.Ct. 1868, 1872 n. 10, 80 L.Ed.2d 404 (1984). A court may assert "general" jurisdiction over a non-resident defendant "[i]f the defendant's activities in the state are 'substantial' or 'continuous and systematic,' ... even if the cause of action is unrelated to those activities." Haisten v. Grass Valley Medical Reimbursement Fund, Ltd., 784 F.2d 1392, 1396 (9th Cir.1986).[6] "Specific" jurisdiction, on the other hand, refers to the limited jurisdiction of a court in a cause of action that "arises out of the defendant's forum-related activities." Id. at 1397.
 
 
 14
 Two weeks before he was scheduled to try the case, Judge King[7] without elaboration dismissed challenges by CCNI/Atlas to the court's general and specific jurisdiction after receiving briefs and affidavits from the parties. CCNI and Atlas argue that their "undisputed contacts"--nine and one bunkering calls respectively--do not "amount to such 'substantial and systematic' contacts which would support general in personam jurisdiction." PICC, on the other hand, contends that both Atlas and CCNI had substantial contacts in Hawaii. In both of its commercial ventures, for example, Atlas had sub-chartered vessels, directed them to Hawaii, established relationships with ship's agents in Hawaii, and arranged for bunkers in Hawaii to benefit from cheaper fuel prices in the islands. CCNI's contacts with Hawaii included nine bunkering calls; and on each occasion CCNI had appointed ship's agents in Hawaii and paid substantial amounts for bunkers, commissions, and ship handling fees in Hawaii.
 
 
 15
 The Supreme Court has erected a stringent standard for determining which contacts will support a finding of general jurisdiction when the parties assert no relationship between the cause of action and the defendants' contacts with a forum. In Helicopteros, 466 U.S. at 417, 104 S.Ct. at 1873, the Court highlighted the infrequency of the defendant's contacts with Texas and held that "purchases and related trips [by a defendant to the forum state], standing alone, are not a sufficient basis for a State's assertion of jurisdiction." Under this test, therefore, we cannot say that the contacts by CCNI and Atlas by themselves were so extensive that it would be fair to subject them to suit in Hawaii for any reason.
 
 
 16
 The Court, however, specifically left open "(1) whether the terms 'arising out of' and 'related to' describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists." Id. at 415 n. 10, 104 S.Ct. at 1872 n. 10. Personal jurisdiction, therefore, must turn on whether the contacts by CCNI and Atlas provide a sufficient nexus to the causes of action to justify subjecting them to suit in Hawaii under a standard of fairness and reasonableness.
 
 
 17
 This analysis, referred to by the Helicopteros Court as "specific" jurisdiction, id., requires a showing of three distinct elements:
 
 
 18
 (1) the nonresident defendant must purposefully direct his activities or consummate some transaction with the forum or residents thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.
 
 
 19
 Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir.1987) (citations omitted).
 
 
 20
 Ordinarily, our analysis would next proceed with a detailed examination of these three elements. In this case, however, the district court made no explicit findings of fact regarding jurisdiction, but accepted the decisions of prior district judges who had rejected CCNI/Atlas' jurisdictional challenge. Given the incompleteness of the record on appeal and our resolution of the liability issue in favor of the carriers, we regard it as prudent to avoid deciding this difficult question when it does not affect the outcome of the case.
 
 III.
 APPLICATION OF COGSA
 
 21
 A. Inapplicability of COGSA Ex Proprio Vigore.
 
 
 22
 The district court applied the Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. Secs. 1300-1315 (Supp. V 1987), to the bill of lading that served as the contract of carriage in this case. CCNI/Atlas contend that the district court erred in applying COGSA for two reasons: first, the voyage was not "to or from ports of the United States" as required by 46 U.S.C.App. Sec. 1300; and second, the bill of lading states that it is "subject to" the Hague Rules and the American Fire Statute, and not COGSA. Although we find both contentions persuasive, we do not conclude that this error requires reversal.
 
 
 23
 COGSA applies by its own terms to "[e]very bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea to or from ports of the United States, in foreign trade...." 46 U.S.C.App. Sec. 1300. In this case, the bill of lading evidenced a contract for carriage of goods between Lirquen, Chile, and Shanghai, Peoples' Republic of China. Although Honolulu served as a port of discharge for damaged cargo, a distress discharge is insufficient to invoke COGSA ex proprio vigore unless the bill of lading provides a contractual basis for this contingency. This court has recently held that COGSA does not apply of its own force if an essential element of the statute is missing. See, e.g., Institute of London Underwriters v. Sea-Land Serv., Inc., 881 F.2d 761, 765 (9th Cir.1989) (holding that even though the parties incorporated COGSA by reference in the bill of lading, the statute "did not govern this shipment of its own force because COGSA excludes deckloads from its definition of 'goods' ").[8]B. Application of COGSA as a Contractual Term.
 
 
 24
 Although COGSA does not apply ex proprio vigore, the bill of lading provides adequate grounds for applying the statute as a contractual term. The contract of carriage states that it is "subject to" the Hague Rules. These Rules, adopted at the Brussels Convention in August 1924, were an attempt to develop a uniform set of standards to govern bills of lading. See G. Gilmore & C. Black, The Law of Admiralty 139-44 (2d ed. 1975) [hereinafter Gilmore & Black]. The United States formally adopted the Hague Rules in 1936 through passage of the Carriage of Goods by Sea Act, 49 Stat. 1207 (1936) (codified as amended at 46 U.S.C. Secs. 1300-1315 (1982 & Supp. V 1987)). COGSA, therefore, is an effort to codify international standards in American domestic law. See, e.g., Union Ins. Soc'y of Canton v. S.S. ELIKON, 642 F.2d 721, 723 (4th Cir.1981) (COGSA "essentially represents the American enactment of the Hague Rules"); Sunkist Growers, Inc. v. Adelaide Shipping Lines, 603 F.2d 1327, 1333 (9th Cir.1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980) (COGSA is "a statutory codification of The Hague Rules").
 
 
 25
 COGSA and the Hague Rules are virtually identical in their language. The only possible discrepancy is an interpretive one involving the fire exception in COGSA, 46 U.S.C.App. Sec. 1304(2)(b), and the International Convention for the Unification of Certain Rules Relating to Bills of Lading (Hague Rules), art. IV(2)(b), 51 U.S.T. 233, 251, T.I.A.S. No. 8441, at 435, 120 L.N.T.S. 157, 167. Prior to COGSA's passage, bills of lading under American law were subject to the Fire Statute, 46 U.S.C.App. Sec. 182, enacted in 1851. The Fire Statute attempted to free the vessel owner from liability for fires on board unless the fire started because of his "design or neglect." This language differed slightly from COGSA's "actual fault or privity" in the fire exemption, 46 U.S.C.App. Sec. 1304(2)(b). Nevertheless, Mr. Cletus Keating, who represented the American Steamship Owners' Association at the 1935 hearings on COGSA, testified that commercial interests viewed these clauses as having the same legal effect:
 
 
 26
 I personally do not believe there is any difference between actual fault, privity, design, or neglect. This language here on line 8, page 7, follows the language of the British statute, and, of course, that is the language of the original convention, and I do not believe we ought to put in different words, because that would interfere with the effectivity of the language; and as it is, I do not think it interferes with the uniformity of the substance.
 
 
 27
 Carriage of Goods by Sea: Hearing on S. 1152 Before the Senate Comm. on Commerce, 74th Cong., 1st Sess. 60 (1935). Gilmore and Black observe that the courts have interpreted COGSA "to save the Fire Statute from repeal." Gilmore & Black, supra, at 161.
 
 
 28
 Because the Hague Rules do not have this antecedent, the fire exception under the international version could yield a different interpretation from COGSA. The parties have rendered this possibility moot, however, by specifically incorporating the Fire Statute into the bill of lading. This obviates any discernible difference between the Hague Rules and COGSA.[9] Irrespective of whether the Hague Rules/Fire Statute clause or the COGSA clause of the bill of lading applies, the result is precisely the same.
 
 
 29
 It follows, therefore, that the district court's application of COGSA does not constitute error.IV.
 
 CONTRACT OF CARRIAGE
 
 30
 CCNI and Atlas argue vigorously that they should not be held as contracting parties to the bill of lading, although their contentions run in different directions. Atlas, on the one hand, asserts that it had no contract with China Light because it did not issue a bill of lading for the wood pulp. The district court made no explicit finding of fact regarding this issue. Some courts have held a non-contracting party liable under the bill of lading, see, e.g., Gans S.S. Line v. Wilhelmsen, 275 F. 254, 262-3 (2d Cir.), cert. denied, 257 U.S. 655, 42 S.Ct. 97, 66 L.Ed. 419 (1921) (per Hough, J.); Joo Seng Hong Kong Co. v. S.S. UNIBULKFIR, 483 F.Supp. 43, 46-7 (S.D.N.Y.1979), but other courts confronting this issue have been reluctant to find such a party liable to the cargo interests. See, e.g., Pacific Employers Ins. Co. v. M/V GLORIA, 767 F.2d 229, 236 (5th Cir.1985) (upholding as not clearly erroneous district court finding that voyage charterer did not issue bill of lading and thus was not a COGSA carrier); Demsey & Assocs. v. S.S. SEASTAR, 461 F.2d 1009, 1019 n. 2 (2d Cir.1972).
 
 
 31
 CCNI, on the other hand, argues that even though it issued the bills of lading for the pulp on its own form, it escapes liability because the contract contained a "demise" clause. This provision purports to relieve the charterer of liability by stating that the contract of carriage was made with the shipowner, and not its agent, CCNI. CCNI thus avers that unless the demise clause is invalid, it is not contractually bound to the cargo interests. Although a district court has invalidated a similar provision, see, e.g., Epstein v. United States, 86 F.Supp. 740, 742-43 (S.D.N.Y.1949), we have found no circuit court authority on this question.
 
 
 32
 Both contentions raise interesting and difficult issues to resolve. To hold CCNI and Atlas liable as contracting parties without caveat would create a precedent for similarly situated litigants in the future. We can and should avoid these issues. This is made possible by our holding that CCNI and Atlas are not liable because PICC cannot prove that the carriers' unseaworthiness caused the cargo damage. We next address the support for this holding.
 
 V.
 BURDEN OF PROOF ON THE CARGO DAMAGE CLAIM
 
 33
 The trial court based its resolution of the case solely on the issue of burden of proof: "I, therefore, find against the party upon whom the law places the burden of proof.... Basing my decision solely upon my allocation of the burden of proof, I find that the plaintiffs failed to prove that the unseaworthiness was the cause of the damage in hold number 3."[10]
 
 
 34
 We review de novo the district court's selection of the appropriate burden of proof. United States v. McConney, 728 F.2d 1195, 1201-04 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 35
 Appellants maintain that the court below erred as a matter of maritime law, because the burden of proof shifts back and forth between plaintiffs and defendants, in what the Fifth Circuit likens to "the ping-pong game of burden shifting mandated by Sections 3 and 4 [46 U.S.C. Secs. 1303 and 1304]." Quaker Oats Co. v. M/V TORVANGER, 734 F.2d 238, 240 (5th Cir.1984), cert. denied, 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985) (citation omitted). In general, the appellants' description of burden shifting is accurate enough, but it avails them nothing.A. The General Structure of Burden of Proof.
 
 
 36
 We begin by observing that the courts of appeal disagree sharply on what burden of proof standard to apply under COGSA's fire exception, 46 U.S.C.App. Sec. 1304(2)(b).[11] However, we shall address the merits of the other circuits' positions only insofar as they offer guidance in the development of Ninth Circuit law.
 
 
 37
 After Sunkist Growers, Inc. v. Adelaide Shipping Lines, 603 F.2d 1327 (9th Cir.1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980), this court has applied a four-part standard for determining the burden of proof in cases involving COGSA's section 1304(2) exceptions. See Taisho Marine & Fire Ins. Co. v. M/V SEA-LAND ENDURANCE, 815 F.2d 1270 (9th Cir.1987) (applying the Sunkist burden of proof analysis to the Sec. 1304(2)(c) peril of the sea exception). Under this analysis, a court allocates the burden of proof as follows:
 
 
 38
 1. The plaintiff cargo interests have the burden of proving a "prima facie case against the carrier by showing that the cargo was delivered in good condition to the carrier but was discharged in a damaged condition." Taisho, 815 F.2d at 1274.
 
 
 39
 2. "The burden of proof then shifts to the vessel owner to establish that the loss came under a statutory exception to COGSA." Id. at 1274-75.
 
 
 40
 3. "The burden then returns to the shipper to show, at a minimum, concurrent causes of loss in the fault and negligence of the carrier, unless it is a type of negligence excluded under COGSA." Id. at 1275.
 
 
 41
 4. "The carrier then has the burden of allocating the loss between (1) the loss caused by his fault and negligence and (2) the loss covered under the exception.... The burden of proof, however, alters when a carrier seeks exoneration under [a Sec. 1304(2) exception, whereby] the carrier acquires the additional burden of showing freedom from negligence." Id. (citations omitted).
 
 
 42
 Appellant PICC asserts that the district court erred by failing to employ this burden of proof.[12] Aside from DBC's attempt to introduce causation into the burden of proof equation, the parties agree that the Taisho four-step process is the appropriate allocation of proof burdens. They disagree, however, about how the second step--the invocation by the carrier of the fire exception--functions.
 
 
 43
 B. The Seaworthiness Requirement and Section 1304(1).
 
 
 44
 Section 1303(1)(a) imposes on the carrier the duty "to exercise due diligence" to "make the ship seaworthy." Section 1304(1) states that "[w]henever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section." (Emphasis added.) Under the Sunkist rule, the carrier has an "overriding obligation" to make the ship "seaworthy" and "if that obligation is not fulfilled and the nonfulfillment causes the damage, the fire immunity of Section 4, Paragraph 2(b), cannot be relied upon by [carriers]." 603 F.2d at 1341 (emphasis added).
 
 
 45
 PICC argues that the Sunkist holding embraces the proposition that when the carrier does not exercise due diligence to make the ship seaworthy, it cannot claim the fire exception even if the unseaworthiness is found not to have caused the damage. We reject this proposition, on the basis of unequivocal legislative history.
 
 
 46
 When Congress considered the legislation that became COGSA from 1923 to its eventual enactment in 1936, it exhaustively questioned persons who had served as members of the American delegation to the European conventions that led to the promulgation of the Hague Rules at the Brussels Convention of 1924. To a man, these experts testified year after year that the provision that became 46 U.S.C.App. Sec. 1304 was intended to change the existing law under the Harter Act, 46 U.S.C.App. Secs. 190-95 (Supp. V 1987), to make it more favorable to shipowners. Indeed, the change contemplated and eventually enacted was the only benefit carriers received under COGSA that was a change from existing law.
 
 
 47
 In the first hearing on COGSA, Mr. Norman Beecher, the special admiralty counsel of the United States Shipping Board and a United States representative to the Brussels Conventions of 1922 and 1923, testified to this effect:
 
 
 48
 This section [Sec. 1304] constitutes a modification of the Harter Act, in that it does not make it a condition precedent to the carrier receiving the benefit of these exceptions that he shall have exercised due diligence to make the ship in all respects seaworthy--properly manned, equipped, and so forth. It is true that the shipowner is under that obligation just as fully as before.
 
 
 49
 . . . . .
 
 
 50
 The change, in reality, would affect but few cases. It presents such a situation as this: Suppose a ship sails from New York and, in going down the harbor, owing to an error of the master, she comes into collision with another ship. The compass has not even had the cover taken off; the navigation is all in full view and it is simply an error of navigation on the part of the master, but it is found that the compass is out of order. Now, as that unseaworthiness had not the slightest cause in connection with the disaster, as no one ever looked at the compass, even, it would seem that the shipowner should not be liable, should not be deprived of the Harter Act exemption from liability, as a result of the error of navigation, but probably under existing law that would be the case. Now, this changes that: It says, in effect, that the carrier, whenever there is unseaworthiness, whenever he has failed in the duty of due diligence, to have the ship seaworthy and whenever that has resulted in a damage or loss, he must pay for it; but it does not deprive him of the benefit of these exceptions where that failure on his part has had nothing whatever to do with the disaster.
 
 
 51
 Relating to the Carriage of Goods by Sea: Hearings Before the House Comm. on the Merchant Marine and Fisheries, 67th Cong., 4th Sess. 15 (1923) (emphasis added).
 
 
 52
 Other witnesses testified that this was the sole benefit enjoyed by shipowners under the proposed law, and that "only one lawyer in the room, in the course of a combined practice, perhaps, of 100 years, has ever had a case ... that devolved on this question of whether seaworthiness is a condition precedent to the benefit of the Harter Act." Id. at 99 (statement of Mr. Charles S. Haight, Chairman of the Bill of Lading Committee of the International Chamber of Commerce).
 
 
 53
 The congressional witnesses were thus cognizant that the question posed in this case occurs with great infrequency, but they nevertheless believed that the formula adopted in the bill would reverse a Supreme Court decision that had interpreted the Harter Act in a manner similar to the argument advanced by PICC with respect to COGSA. Mr. Ira Campbell, general counsel of the American Steamship Owners' Association, submitted a memorandum in the 1936 hearings that explained this change:
 
 
 54
 The principal gain to the carrier under the bill, therefore, would be the exemption from loss or damage from the enumerated causes, such as negligence in navigation, without being required to show, as a condition precedent, that due diligence was exercised to make the vessel seaworthy, unless unseaworthiness contributed to the loss.
 
 
 55
 . . . . .
 
 
 56
 This slight change in the law would admittedly be advantageous to shipowners, because they would be relieved from the effects of the recent decision of the United States Supreme Court in the case of May v. Hamburg American Line [The ISIS ] (290 U.S. 333 [54 S.Ct. 162, 78 L.Ed. 348]. There the Supreme Court, interpreting the Harter Act, held, in effect, that a shipowner was not entitled to an exemption from liability for loss caused through error in navigation, if he failed to use due diligence to make the vessel seaworthy in all respects whatsoever, and whether or not unseaworthiness had any casual [sic] connection with the loss.
 
 
 57
 Uniform Ocean Bills of Lading: Hearings on S. 1152 Before the House Comm. on Merchant Marine and Fisheries, 74th Cong., 2d Sess. 62 (1936) (emphasis added).[13]
 
 
 58
 The legislative history makes clear, therefore, that when the unseaworthiness was not the cause of the loss or damage the carrier does not have the burden of showing that the ship was seaworthy as a condition for invoking one of the section 1304(2) exemptions. Accordingly, we find that the district court committed no error by holding that the cargo interests had the burden of proving that the unseaworthiness caused the damage in order to block the carriers' access to section 1304(2) exemptions. Our analysis of the burdens of proof does not, however, end here. We must examine the burden of proof with respect to the exemption itself.
 
 
 59
 C. The Burden of Proof for the Fire Exception.
 
 
 60
 Section 1304(2)(b) excuses the carrier or the ship from responsibility "for loss or damage arising or resulting from ... [f]ire, unless caused by the actual fault or privity of the carrier." The provision itself does not state on which party the burden of proof lies when the cause of the fire is unknown. None of our earlier cases present facts that pose this specific problem. In earlier cases unseaworthiness was the cause of the damage. See, e.g., Sunkist Growers, Inc. v. Adelaide Shipping Lines, 603 F.2d 1327, 1341 (9th Cir.1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980) (holding that carrier could not invoke the fire exemption if it failed to carry the burden of showing due diligence to make the ship seaworthy and the unseaworthiness caused the cargo damage); In re Liberty Shipping Corp., 509 F.2d 1249, 1252 (9th Cir.1975) (holding that carrier could not invoke COGSA and Fire Statute exemptions where the "unseaworthy conditions that were the cause of the fire damage existed by reason of owner neglect or actual fault"). Here unseaworthiness has not been established as the cause of the damage.
 
 
 61
 When that is the case, the shifting burdens of proof take a slightly different focus. First, the carrier has the burden to show that the loss was caused by one of the section 1304(2) exemptions, in this case, fire. 46 U.S.C. Sec. 1304(2)(b). That burden has been successfully borne in this case. At this point the burden returns to the shipper to prove that the fire was "caused by the actual fault or privity of the carrier." Id.[14] See In re Ta Chi Navigation (Pan.) Corp., S.A., 677 F.2d 225, 228 (2d Cir.1982) (" 'If the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused' the fire or prevented its extinguishment.") (quoting Asbestos Corp. v. Compagnie De Navigation Fraissinet et Cyprien Fabre, 480 F.2d 669, 673 (2d Cir.1973)).
 
 
 62
 Once more we rely on legislative history for support. During the testimony on the carriers' section 1304(2) exemptions, the House Committee on Merchant Marine and Fisheries focused on the different language contained in subsection (q), which places the burden of proof "on the person claiming the benefit of this exception to show that neither the actual fault or privity ... contributed to the loss or damage." 46 U.S.C.App. Sec. 1304(2)(q).[15] Judge Ewin Davis, Congressman from Tennessee, noted that subsection (q) "does not relate back to those other provisions at all; that does not impose the burden of proof upon the carrier in any of those enumerated causes, except that in (q)." Relating to the Carriage of Goods by Sea: Hearings Before the House Comm. on the Merchant Marine and Fisheries, 71st Cong., 2d Sess. 118 (1930). Accordingly, once the carrier has established that the fire caused the loss or damage, the burden returns to the shipper to show that the carrier's negligence caused the loss.
 
 
 63
 Sunkist, 603 F.2d at 1327, does not alter this analysis. In Sunkist, the court did not reach the question before us. The Sunkist court merely reasoned that because the ship's unseaworthiness caused the loss, the carrier could not invoke the fire exception. Id. at 1336. A different issue arises in this case. Here the cargo interests have failed to carry their burden of proof to show that unseaworthiness had caused the loss and now insist that they need not show that the carriers' negligence caused the fire. This would weight the scales too heavily in favor of the cargo interests.
 
 
 64
 D. Did the Cargo Interests Meet Their Burden of Proving that the Carriers' Negligence Caused the Fire or Prevented its Extinguishment?
 
 
 65
 This court reviews the district court's determination of whether "the established facts fall within the parameters of [a COGSA Sec. 1304(2) ] defense under the deferential, clearly erroneous standard." Taisho, 815 F.2d at 1272; see also United States v. McConney, 728 F.2d 1195, 1200 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 66
 PICC argues that it met this burden first by establishing that, even if the CO2 would only have delayed the need for flooding, this delay would have decreased damages, because the damages increased over time. PICC cites no authority--scientific or otherwise--for this argument, and the district court rejected this position in the findings of fact and conclusions of law. We thus find no clear error on this point.
 
 
 67
 Second, PICC argues that because the court found that improper loading created a high fire risk, the defendants are liable for their role in this concurrent cause. In our view, this argument is simply another attempt to impose liability on the carriers when the district court could not determine that the carriers caused the cargo damage in not providing a fixed CO2 system. The court explained this seeming contradiction in the Findings of Fact and Conclusions of Law:
 
 
 68
 I realize that the finding that the ship was not seaworthy because she did not have a fixed CO2 system and the finding that such a system would not have extinguished the fire is oxymoronic in character. But a CO2 system does afford some protection from the fire hazard and had the loading of the ship and the distances involved been different, a CO2 system might have prevented or minimized the damages in this case.
 
 
 69
 We read this passage to mean that the peculiar circumstances of this case make it impossible to find that the carrier caused the fire. We thus reject appellants' attempt to shift the burden back to the carriers to segregate damages by proving a concurrent cause of loss. See Hoskyn & Co. v. Silver Line, 143 F.2d 462, 465-66 (2d Cir.), cert. denied, 323 U.S. 767, 65 S.Ct. 116, 89 L.Ed. 613 (1944) (holding that where cargo cannot prove that carriers caused the fire, the fire exemption relieves the carrier of liability).
 
 
 70
 Finally, PICC claims that violation of the International Convention for the Safety of Life at Sea (SOLAS), 1974, 32 U.S.T. 47, T.I.A.S. No. 9700, creates a presumption of causation which presumably would relieve cargo of the burdens of proof it has not been able to discharge. SOLAS, which is binding on the DAMODAR TANABE, requires ships carrying high risk cargo to have CO2 fire systems aboard. PICC asserts that violation of SOLAS requirements constitutes a breach of a statutory safety regulation. Under the rule of THE PENNSYLVANIA, 86 U.S. (19 Wall.) 125, 136-37, 22 L.Ed. 148 (1873), when a carrier violates a statutory rule, the burden rests on the ship to show "that it could not have been" a contributing cause of the disaster.
 
 
 71
 This circuit recognizes SOLAS as having the status of law enforceable in American courts. Alkmeon Naviera, S.A. v. M/V "MARINA L", 633 F.2d 789, 793 (9th Cir.1980). The parties, however, dispute whether a violation of SOLAS occurred. Under the Convention, the "Administration" decides whether a particular cargo presents a fire risk for purposes of exempting the requirement of a fixed CO2 fire system. If the home government so determines, it may exempt the vessel from equipping the ship with a CO2 system. The "Administration" in this case is India. It has determined that the DAMODAR TANABE need not be equipped with a CO2 system. We must determine whether its opinion is controlling.
 
 
 72
 Although the rule of THE PENNSYLVANIA is favored in this circuit, see, e.g., Waterman S.S. Corp. v. Gay Cottons, 414 F.2d 724, 736 (9th Cir.1969), we regard this as a special case. We do not believe that the finding of the district court regarding seaworthiness should serve as the required factual predicate for a statutory violation when the statute is a treaty that calls on a foreign nation to determine whether a CO2 fire system is necessary. A finding that the carriers violated SOLAS would effectively override the decision of a foreign nation on a question a government executive agency is better able to decide. India's resources exceed those of this court to determine whether normally loaded wood pulp constitutes a sufficiently high fire risk to require CO2 -fitted ships.
 
 
 73
 We are also wary of applying the rule of THE PENNSYLVANIA to a treaty violation rather than a statutory violation, because it would invite other courts to engage in the practice. The factfindings of American lawsuits could expose shipowners to unforeseeable liability after they have already received a ruling from their home nation that their vessel complies with the treaty. We believe that such a precedent would neither create good law nor advance a desirable public policy.
 
 
 74
 We conclude that the cargo interests have failed to establish the predicate necessary to permit the establishment of improper stowage as a concurrent cause of the loss. Therefore, we do not reach the fourth stage in the burden of proof analysis, which would return the burden of proof to the carriers of allocating the loss between the amount caused by their own fault and negligence and the portion caused under the exception.
 
 VI.
 INTEREST ON THE CARGO WETTING CLAIMS
 
 75
 We review decisions granting prejudgment interest on an abuse of discretion standard. Columbia Brick Works, Inc. v. Royal Ins. Co. of Am., 768 F.2d 1066, 1068 (9th Cir.1985). In Columbia Brick Works, we held that the statutory rate for postjudgment interest "is also appropriate for fixing the rate for prejudgment interest unless the equities of a particular case demand a different rate." Id. at 1071.
 
 
 76
 PICC notes that the proper statutory interest rate effective in mid-February 1985 was 9.17% per annum. The district court awarded seven percent for the wetting claim. PICC contends, without challenge from the other side, that the court abused its discretion by awarding seven percent when it did not state the reason for this decision. We agree and vacate the district court's assessment of prejudgment interest. In its stead, we award prejudgment interest on this claim of 9.17% per annum.
 
 VII.
 GENERAL AVERAGE
 
 77
 The bills of lading each contained a "New Jason Clause," which provided in pertinent part:
 
 
 78
 In the event of accident, danger, damage or disaster ... for which, the Carrier is not responsible, by statute or contract or otherwise, the goods, the shipper, consignee, or owner of the cargo, jointly and severally, shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of general average nature that may be made or incurred....
 
 
 79
 Gilmore and Black explain that in such a case, "the issue as to liability of the cargo to contribute may often ... involve exactly the same questions as would have arisen had the case been one of cargo damage...." Gilmore & Black, supra, at 267.
 
 
 80
 A. Availability of General Average.
 
 
 81
 Both sides in this case concur that the liability issues on cargo damage are identical to those for the vessel's general average counterclaim. The district court found the shipowner without fault on the cargo claim and thus ruled in favor of the general average counterclaim. PICC urges reversal on two grounds. First, it claims that reversal of the judgment for flooding damage will automatically require reversal of the general average counterclaim. We have already rejected the substance of these arguments. "[I]t follows under the terms of the new Jason Clause, that [the vessel] owner's claims for contribution in general average would succeed." L. Buglass, Marine Insurance and General Average in the United States 294 (2d ed. 1981).
 
 
 82
 Second, PICC contends that even if we do not reverse on the liability issue, the vessel owner cannot impose general average because it did not bear its burden of proving that the general average counterclaim was properly allowable.[16] PICC's position rests on the assertion that because the trial court ruled that it would "find against the party upon whom the law places the burden of proof," this determination "also controls the general average claim."
 
 
 83
 PICC misinterprets Rule E of the York-Antwerp Rules, which places the burden of proof on the party claiming the general average. DBC has the burden of showing that this situation constituted a general average act under Rule A[17] and that the losses for which contribution is sought directly resulted from the general average act as per Rule C.[18] The cases cited by the parties run at cross purposes. Sea-Land Serv., Inc. v. Aetna Ins. Co. [THE BEAUREGARD], 545 F.2d 1313, 1316 (2d Cir.1976), cited by DBC, involved an attempt to have certain facts classified as a general average act. The court assessed the burden of proof according to Rule E of the York-Antwerp Rules, which concerns whether an act appropriate for general average has occurred. Id. at 1316. In Orient Mid-East Lines, Inc. v. A Shipment of Rice (S.S. ORIENT TRANSPORTER), 496 F.2d 1032, 1042-43 (5th Cir.1974), cert. denied, 420 U.S. 1005, 95 S.Ct. 1447, 43 L.Ed.2d 763 (1975), cited by PICC, the court denied general average, but did so in part because the counterclaim was brought outside the statute of limitations. The burden of proof discussion in Orient Mid-East Lines relates not to general average, but to the cargo loss claim. See 496 F.2d at 1041-43. The vessel owner, therefore, has the burden to show that these are general average damages, and does not have the burden of proving the underlying liability for those damages. Accordingly, we affirm the district court's award of general average to the shipowner.
 
 
 84
 B. Interest on General Average.
 
 
 85
 A second general average issue is whether the district court correctly awarded interest for general average at seven percent. DBC complains that the district court awarded seven percent interest after the general average statement was issued on September 30, 1987. The York-Antwerp Rules, to which the parties agreed, only specify interest of seven percent up to the date of the general average statement. Neither party cites any case or statutory law that govern interest after the issuance of the general average statement. The Rule on interest, however, makes clear that the 7 percent rate shall be charged "until the date of the general average statement." Rule XXI, York-Antwerp Rules, reprinted in Buglass, supra, at 593 (emphasis added).
 
 
 86
 We do not interpret the Rule as governing interest charged after the date of the general average statement. We thus adopt the more equitable solution of treating interest accruing after the general average statement the same as prejudgment interest for damage awards. Accordingly, we vacate the district court's award of seven percent interest for the time period after the statement and award DBC post-statement interest at a rate of 9.17% per annum.
 
 VIII.
 CONCLUSION
 
 87
 Based on the foregoing, we affirm the district court in all respects except insofar as it improperly assessed interest for claims to wetting damage and general average. We remand for entry of judgment in accordance with the instructions of this opinion.
 
 
 88
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 [1]
 Referred herein with People's Insurance Company of China (PICC) as the cargo interests
 
 
 [2]
 The Honorable Russell E. Smith, Senior District Judge, District of Montana, sitting by designation
 
 
 [3]
 The court noted:
 I think it strange that a Court of the United States should have jurisdiction of a case which arose outside the United States and which involves parties none of whom is a citizen or resident of the United States. Other judges sitting in this case have found that there was jurisdiction. Obedient to the rule that one district judge should not overrule another, except for urgent reasons, I abide by the orders of Judge Coyle and Judge King finding that there was jurisdiction.
 Record Excerpts, at 97.
 
 
 [4]
 See, e.g., Philippine Packing Corp. v. Maritime Co. of Philippines, 519 F.2d 811, 812 (9th Cir.1975) (per curiam) (holding that the district court did not abuse its discretion by dismissing suit involving foreign plaintiff and foreign defendant under doctrine of forum non conveniens); Paper Operations Consultants Int'l, Ltd. v. S.S. HONG KONG AMBER, 513 F.2d 667, 672 (9th Cir.1975) (same). Under the forum non conveniens doctrine, the court has personal jurisdiction over the defendant, but dismisses because "trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and ... the plaintiff is unable to offer any specific reasons of convenience supporting his choice." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419 (1981). Because CCNI/Atlas do not seek dismissal under this doctrine, we need not evaluate the private and public interest factors developed by the Supreme Court in Piper. See id. at 241 n. 6, 102 S.Ct. at 258 n. 6
 
 
 [5]
 It is well-settled that the minimum contacts analysis, even for a federal court sitting in admiralty, must assess a defendant's contacts with a state, rather than the United States as a whole. Commentators have recently advocated applying a "national" contacts analysis to foreign defendants in other federal contexts. See, e.g., Comment, "National Contacts as a Basis for In Personam Jurisdiction over Aliens in Federal Question Suits," 70 Calif.L.Rev. 686, 686-97 (1982) (advocating a national contacts test over alien defendants in federal question cases); Note, "Alien Corporations and Aggregate Contacts: A Genuinely Federal Jurisdictional Standard," 95 Harv.L.Rev. 470, 481 (1981) (advocating aggregate contacts test for alien corporations). The district court did not address, nor did the parties brief, this novel question. At least one federal court, however, has adopted a national contacts test in an admiralty case. See, e.g., Holt v. Klosters Rederi A/S, 355 F.Supp. 354, 357 (W.D.Mich.1973) (analyzing minimum national contacts under the Fifth Amendment)
 
 
 [6]
 The plaintiff "bears the burden of proving by preponderance of the evidence facts which substantiate the exercise of jurisdiction by the district court." Haisten, 784 F.2d at 1396
 
 
 [7]
 The Honorable Samuel P. King, Senior District Judge, District of Hawaii
 
 
 [8]
 Our earlier case, Tessler Bros. (B.C.) Ltd. v. Italpacific Line, 494 F.2d 438 (9th Cir.1974), arguably may be authority for the opposite proposition. In Tessler Brothers, which introduced the fair opportunity requirement to COGSA, the court applied COGSA to a bill of lading for shipment between Italy and British Columbia that discharged cargo in distress in Tacoma, Washington. The Tessler Brothers court does not make clear whether it was applying COGSA ex proprio vigore or as a contractual term. Given this ambiguity, we read Institute of London Underwriters as the authoritative statement of this circuit's law on this point
 
 
 [9]
 See also L. Buglass, Marine Insurance and General Average in the United States 299 (2d ed. 1981) ("[F]or all practical purposes the words 'design or neglect' used in the so-called 'Fire Statute' of the U.S. (46 U.S.Code, s. 182) have a similar meaning as the phrase 'fault or privity' in [COGSA]. The protection against losses by fire afforded the shipowner by both statutes is therefore identical.")
 
 
 [10]
 Appellee DBC, in its cross-appeal, urges us to hold that the district court erred by finding the DAMODAR TANABE unseaworthy. DBC contends that the ship's receipt of a SOLAS certificate and erroneous factfindings by the district court warrant reversal on this ground alone. We disagree. Implicit in the district court's ruling is the idea that "seaworthiness is not an absolute but a relative term. It is to be considered in relation to the voyage undertaken, the cargo to be carried, and its stowage." 2A Benedict on Admiralty 7-2 (7th ed.1990). Accordingly, the district court did not feel bound to rule that the ship was seaworthy simply because it had a SOLAS certification. We do not regard this holding, nor the court's factfindings relating to the seaworthiness issue, as clearly erroneous
 
 
 [11]
 The Second Circuit was the first to address the issue. See, e.g., Asbestos Corp. v. Compagnie de Navigation Fraissinet et Cyprien Fabre, 480 F.2d 669, 673 (2d Cir.1973) (holding that "[i]f the carrier shows that the damage was caused by fire, the shipper must prove that the carrier's negligence caused the damage"). This opinion sparked a heated exchange among the circuits. The Ninth Circuit, the next to address the question, chided the Second for employing language "entirely unnecessary to the decision" and for the "casual treatment of the burden of proof by the author of the appellate court opinion." Sunkist Growers, Inc. v. Adelaide Shipping Lines, 603 F.2d 1327, 1335 (9th Cir.1979), cert. denied, 444 U.S. 1012, 100 S.Ct. 659, 62 L.Ed.2d 640 (1980). Accordingly, the Sunkist court placed the burden on the carrier to show due diligence in providing a seaworthy ship. Id. at 1336-37
 The Second Circuit did not take this criticism lightly. In In re Ta Chi Navigation (Pan.) Corp., S.A., 677 F.2d 225, 229 (2d Cir.1982), the court "disagree[d] not only with Sunkist's unflattering characterization of Judge Timbers' opinion in Asbestos ... but also with the Ninth Circuit's interpretation of the interrelation between the Fire Statute and COGSA...." The Second Circuit reaffirmed the Asbestos view and opened the circuit split wider.
 The Fifth Circuit then sided with the Second Circuit's interpretation. In Westinghouse Elec. Corp. v. M/V "LESLIE LYKES ", 734 F.2d 199, 207 (5th Cir.), cert. denied, 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984), the court commented that "[w]e need not look far upward to reject the Ninth Circuit's construction of the Fire Statute." The court then relied on a Supreme Court case (Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932)) interpreting the Fire Statute handed down four years before the enactment of COGSA in 1936.
 The magnitude of this circuit split has not gone unnoticed. One commentator has observed that "[a]lthough the Supreme Court often allows an issue to 'percolate' in the lower courts before deciding it, further lower court consideration of these issues is unlikely to be beneficial." Sturley, "Observations on the Supreme Court's Certiorari Jurisdiction in Intercircuit Conflict Cases," 67 Texas L.Rev. 1251, 1267-68 (1989) (referring generally to intercircuit conflicts in COGSA cases and specifically to the fire exception conflict) (footnote omitted).
 
 
 [12]
 DBC obfuscates this issue somewhat by contending that cargo interests have the burden of proof on causation to establish a prima facie case. The case law does not support this contention. PICC accurately cites Socony Mobil Oil Co. v. Texas Coastal & Int'l, Inc., 559 F.2d 1008 (5th Cir.1977) for the proposition that plaintiff cargo interests need not prove the causal connection between the vessel's defects and the damage to the cargo. "Once [plaintiffs] successfully demonstrated that the cargo was loaded in good condition, and discharged in damaged condition, the burden was on the defendants to show that the cause of the damage was one of the risks for which carriers are not liable." Id. at 1013. If the Socony carrier had claimed a Sec. 1304(2) exception, the court would have properly placed the burden of proof at that stage on the carrier. See also Gilmore & Black, supra, at 183-85 (discussing the different burdens of proof imposed on the parties)
 
 
 [13]
 Each COGSA hearing contains references that reiterate this point. See, e.g., Relating to the Carriage of Goods by Sea: Hearings Before the House Comm. on the Merchant Marine and Fisheries, 68th Cong., 2d Sess. 130, 190 (1925); International Convention for the Unification of Certain Rules in Regard to Bills of Lading for the Carriage of Goods by Sea: Hearing Before a Subcomm. of the Senate Foreign Relations Comm., 70th Cong., 1st Sess. 4, 30 (1927); Relating to the Carriage of Goods by Sea: Hearings Before the House Comm. on the Merchant Marine and Fisheries, 71st Cong., 2d Sess. 30, 39, 42-43, 73-74 (1930); Carriage of Goods by Sea: Hearings Before the Senate Comm. on Commerce, 74th Cong., 1st Sess. 18-19 (1935)
 
 
 [14]
 The existence of the Fire Statute, 46 U.S.C.App. Sec. 182, as a contractual term in the bill of lading does not change this analysis. Under that statute, the carrier must prove that the loss was caused by fire, and then the shipper must prove that the fire was "caused by the design or neglect of such owner." 46 U.S.C.App. Sec. 182. We agree with the Second Circuit that "design or neglect" is functionally equivalent to "actual fault or privity." Asbestos Corp. v. Compagnie De Navigation Fraissinet et Cyprien Fabre, 480 F.2d 669, 672 (2d Cir.1973)
 
 
 [15]
 46 U.S.C.App. Sec. 1304(2)(q) (Supp. V 1987), provides:
 Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from--
 (q) Any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.
 
 
 [16]
 Under the York-Antwerp Rules of 1974, to which the parties acceded in their bills of lading, "[t]he onus of proof is upon the party claiming in general average to show that the loss or expense claimed is properly allowable as general average." Rule E, York-Antwerp Rules, 1974, reprinted in Buglass, supra, at 581
 
 
 [17]
 Rule A states: "There is a general average act when, and only when, any extraordinary sacrifice or expenditure is intentionally and reasonably made or incurred for the common safety for the purpose of preserving from peril the property involved in a common maritime adventure."
 
 
 [18]
 Rule C provides in relevant part: "Only such losses, damages or expenses which are the direct consequence of the general average act shall be allowed as general average."